588 So.2d 413 (1991)
Charles L. CULPEPPER
v.
MISSISSIPPI STATE BAR.
No. 89-BA-1347.
Supreme Court of Mississippi.
July 24, 1991.
As Modified on Denial of Rehearing November 20, 1991.
John S. Holmes, Holmes & Holmes, Yazoo City, for appellant.
Michael B. Martz, Jackson, for appellee.
EN BANC.
SULLIVAN, Justice, for the Court:
On September 21, 1988, the Mississippi State Bar filed a Formal Complaint against Charles L. Culpepper, contending that he had violated disciplinary rules DR1-102(A)(4, 5, and 6), DR6-101(A)(2), and DR7-101(A)(1, 2, and 3) of the Code of Professional Responsibility; Rules 1.2(a), 1.3, 3.2, 3.3(a)(1 and 4), 3.4(a and b), and 8.4(c and d) of the Rules of Professional Conduct; and Section 73-3-35 of the Mississippi Code of 1972, the oath of attorneys.[1] The allegations arose from Culpepper's representation of a client during divorce proceedings. Culpepper denied any misconduct and asked that the Complaint be dismissed with prejudice.
The Complaint Tribunal conducted a hearing on the matter on April 25 and 26, 1989. On October 23, 1989, the Complaint Tribunal entered its Opinion and Judgment *414 and found that Culpepper failed in his representation as follows:
a. Failed to communicate to his client the true basis of the settlement reached between the attorneys before announcing the same in open court;
b. Failed to communicate to the Court his client's true agreement;
c. Failed to advise his client that the agreement being filed, at the time of judgment, was not the same nor in conformity with her signed agreement of June 25, 1987; and
d. Presenting a judgment and accompanying agreement to the Chancery Court of Yazoo County on the representation that all parties had agreed thereto knowing at the time that in fact such representation was not true.
As a result of Culpepper's misconduct, the Tribunal determined that Culpepper had demonstrated unprofessional and unethical conduct in violation of DR1-102(A)(4, 5, and 6) and DR7-101(A)(1, 2, and 3) of the Code of Professional Responsibility, and Rules 1.2(a), 3.3(a)(1 and 4), 3.4(a and b), and 8.4(c and d) of the Rules of Professional Conduct. The Tribunal ordered that Charles Culpepper be suspended from the practice of law for a period of three years. Culpepper appeals.

I.
On April 10, 1986, Pamela Graham filed a Complaint for Divorce against her husband, Charles Graham, on the grounds of irreconcilable differences and habitual cruel and inhuman treatment. She asked for custody of the couple's child, Jeanna, and for a reasonable sum of alimony and child support. At the time her Complaint was filed, Pamela was represented by attorney Griffin Norquist.
During Norquist's representation of Pamela, she filed a Petition for Temporary Hearing to Award Custody, Support and Other Relief. Pamela was awarded temporary custody and temporary child support until the date of September 3, 1986, at which time a hearing was to be held on the merits.
On August 20, 1986, Griffin Norquist requested leave to withdraw as Pamela's attorney. The Motion was a joint request of Norquist and Pamela. Pamela asked Norquist to withdraw because she did not feel that he was doing what she asked him to do. The court allowed Norquist to withdraw.
Pamela next retained attorney Judy Gambrell to represent her in the divorce proceedings. The hearing which had been scheduled for September was not held because Pamela had moved to Missouri and was unable to take off from her new job at that time. During Gambrell's representation, Pamela filed an Amended Complaint to include a property settlement.
On February 23, 1987, Gambrell withdrew from representing Pamela. Gambrell had sent some responses to interrogatories to Pamela to sign, and Pamela made some corrections in the answers before returning them to Gambrell. Specifically, Pamela corrected an answer which indicated that Charles slapped her and knocked her to the floor. Pamela modified the answer because although Charles had threatened to do that, he had never actually done so. She also corrected typographical errors. Pamela wrote to Gambrell explaining the corrections. When Gambrell received the corrected responses, she called Pamela and told her that since Pamela was playing lawyer, she did not need Gambrell to represent her.
The trial date had been reset for March 4, 1987. Gambrell told Pamela to write a letter to Judge Cortright asking him to postpone the hearing. Pamela did so by letter dated February 24, 1987.
Pamela called attorney Charles Culpepper to see if he would represent her. She wrote him a letter on February 25, 1987, confirming their conversation. On March 4, 1987, the date scheduled for the hearing, Culpepper appeared on Pamela's behalf and requested a continuance. The court rescheduled the hearing for June 24, 1987.
The alleged misconduct of Culpepper began almost immediately after he agreed to represent Pamela. Culpepper's testimony as to the events occurring during the *415 course of his representation of Pamela differs substantially from that of Pamela. The events and the testimony regarding the alleged misconduct are discussed below.

II.
In reviewing the proceedings in an attorney disciplinary matter, this Court "is charged by law to inquire whether the evidence in a Complaint Tribunal is clear and convincing." Mississippi State Bar v. Odom, 566 So.2d 712, 714 (Miss. 1990). Although the Complaint Tribunal makes findings of fact and provides this Court with recommendations, we conduct de novo review. Mississippi State Bar v. Nichols, 562 So.2d 1285, 1287 (Miss. 1990); Foote v. Mississippi State Bar Association, 517 So.2d 561, 564 (Miss. 1987). Under that standard, this Court "has the non-delegable duty of ultimately satisfying itself as to the facts, and reaching such conclusions and making such judgments as it considers appropriate and just." Mississippi State Bar v. Varnado, 557 So.2d 558, 559 (Miss. 1990).
Since this Court sits as the trier of fact, we must make a determination regarding the credibility of and weight accorded to the witnesses and any conflicts in the testimony. Hoffman v. Mississippi State Bar, 508 So.2d 1120, 1124 (Miss. 1987). As such, we "may accept or disregard the testimony of a witness, in whole or in part, as [we deem] it worthy or unworthy of belief." Myers v. Mississippi State Bar, 480 So.2d 1080, 1093 (Miss. 1985).
The issues which Culpepper appeals attack the findings made by the Complaint Tribunal. Most of those issues deal with the weight of the evidence.

III.
The Tribunal makes the following statement in its Opinion and Judgment:
It was contended by Mrs. Graham at the hearing that Culpepper led her to believe that the Petition for Temporary Relief was to be heard on May 15, 1987, and that she was put to great expense and inconvenience to travel from Webb City, Missouri to Mississippi for the hearing which was either not scheduled or had been preempted by other settings on the Chancellor's calendar. The controversy over this issue is in total conflict and the conclusion of the conflict is not necessary in this Tribunal Opinion in view of the conclusions reached on matters of grave importance hereafter.
Culpepper contends that the Tribunal erred in finding that the evidence was in conflict about the events prior to the date of trial.
Culpepper agreed to represent Pamela Graham and appeared on her behalf on March 4, 1987, to request a continuance. The court rescheduled the hearing for June 24, 1987. Pamela had several telephone conversations with Culpepper during the month of March. Pamela and her mother made a trip to Mississippi during March, and Pamela met with Culpepper for the first time. Pamela asked Culpepper to schedule a temporary hearing so that she and Jeanna would receive support during the period prior to the hearing to be held on June 24, 1987.
At the disciplinary hearing, Pamela testified that she believed a hearing on temporary support would be held on May 15, 1987. She said she told Culpepper over the phone that she and Jeanna needed temporary support because they were having financial difficulties. Culpepper asked Pamela if she could come to Mississippi on May 15th, because he would be going before the Judge on that date and he would try to schedule a hearing. Pamela told Culpepper that she would be able to come.
Several letters were introduced into evidence which contained references to the date of May 15th. In a letter written by Culpepper on April 1, 1987, to Charles Graham's attorney, Mark Prewitt, Culpepper indicated that a hearing on temporary support would have to be set up if a settlement was not reached soon, since Pamela was having financial difficulties. Another letter written to Prewitt by Culpepper on April 22, 1987, stated that Pamela would like to have $400 in temporary support. Culpepper suggested that if no agreement could be reached, he would like to set a *416 hearing for May 15th, since he had some other matters set for that date.
Pamela wrote to Culpepper on May 7, 1987, asking for an appointment on May 16, 1987, and saying she looked forward to seeing him on May 15th. Her letter was written in response to a letter sent to her by Culpepper asking for her signature on a Petition for Temporary Hearing and on Answers to Interrogatories. Culpepper filed the Petition on May 13, 1987.
Culpepper wrote another letter to Prewitt on May 13, 1987, the day he filed the Petition. Culpepper said that he would be discussing a settlement proposal with Pamela on the 15th, and if a settlement was not possible, he would seek a hearing on the Petition. On May 19, 1987, Culpepper wrote to Prewitt and indicated that Pamela would not agree to a settlement and that it would be in the best interests of Prewitt's client to agree to some sort of temporary support.
Culpepper testified that Pamela told him she would like to have a hearing on temporary support, but on April 17, 1987, he received a telephone message from Pamela indicating that if Charles would pay her $400 by a certain date, she would not seek a temporary hearing. Culpepper said that he and Prewitt did not reach an agreement to hold a hearing on temporary support on May 15, 1987.
Culpepper said that Charles was paying some of Pamela's expenses during that period, although the Petition for Temporary Hearing stated that Charles had not paid any support whatsoever since September 3, 1986. Mark Prewitt, Charles' attorney, said his client told him that he was paying Pamela some support during that period. Culpepper said that he did not push for a temporary hearing because it was too late to do so on May 15, 1987, since the trial was scheduled for June 24th. Also, his client's situation was not an emergency and she was not in a hurry to have a temporary hearing.
Pamela made arrangements to take off from her job on May 15th. She and her mother left Missouri on Thursday, May 14, 1987, to attend the hearing in Mississippi. On May 15, she arrived at the courthouse around 9:00 a.m. as she had been instructed. She brought along her financial statements and bills. There, she was told by the court clerk that Judge Cortright was out of town. When she called Culpepper, he told her to come to his office.
Culpepper said that he knew that Pamela was coming to Mississippi on the 15th. However, he had told her on the phone after receiving the Petition back from her that there was not enough time to set a hearing for the 15th, since the Petition was not filed until the 13th. However, Pamela came to Mississippi anyway since her daughter had an appointment at either the dentist or the allergist.
Pamela said that when she went to Culpepper's office, he told her that he had discovered that Judge Cortright could not meet with them on the 15th, but Culpepper had been unable to contact Pamela because she was traveling. He said the Judge suggested holding the hearing on the 22nd, but since Culpepper did not think that Pamela would be able to attend on that date, the Judge said that Pamela could sign an affidavit to be presented in her absence. Pamela signed an affidavit in Culpepper's office on the 15th, attesting that she had received no support from her husband since September of 1986. The bills and W-2 forms that she had brought along for the hearing were attached to the affidavit. Culpepper told her that he would present the affidavit in her absence.
The affidavit was never presented to Judge Cortright. Culpepper said that his purpose in having Pamela prepare the affidavit was so that he could see what Pamela's situation really was, since she had told him different things at different times. Culpepper denied that the affidavit was prepared in order to be presented to the Judge. Pamela testified that when she later asked Culpepper about the affidavit, he told her that he had given it to the Judge. Pamela never did discover what happened with the affidavit although she questioned Culpepper about it several times. Culpepper finally told her that he could ask the *417 Judge about it but to do so would make the Judge mad.
The testimony of Pamela certainly conflicts with that of Culpepper about the events prior to trial. The letters written to Prewitt by Culpepper offer some support for Pamela's version of the events. Pamela said that Culpepper told her he would be going before Judge Cortright on May 15th. Culpepper's letter to Prewitt dated April 22, 1987, indicated that Culpepper would be going before the Judge on the 15th, since Culpepper had some matters set for that date.
That Pamela was having financial difficulties and wanted a hearing is also supported by the evidence. The Petition for Temporary Hearing, the affidavit, and the letter to Prewitt from Culpepper dated April 1, 1987, all stated that Pamela was having such difficulties.
Pamela's letter to Culpepper on May 7, 1987, is further support of her testimony. In the letter, Pamela said that she was looking forward to seeing Culpepper on the 15th, and asked for an appointment with Culpepper for the 16th. If the hearing for the 15th had been cancelled and Pamela was aware of that fact, she could have made the appointment for the 15th since she ultimately met with Culpepper on that date.
The Complaint Tribunal declined to make a finding on the question of Culpepper's conduct prior to the Graham trial. An examination of the evidence reveals that it is indeed conflicting as to those events. However, the evidence supports a finding that Culpepper's conduct with regard to the temporary hearing was less than professional.

IV.
The first two findings made by the Complaint Tribunal with regard to misconduct by Culpepper are that Culpepper failed to communicate to Pamela the true basis of the settlement reached between the attorneys before the agreement was announced in court and that Culpepper failed to communicate Pamela's true agreement to the court. Culpepper contends that the evidence supports his version that Pamela agreed to the terms which were read in court.
The hearing was set for June 24, 1987. Pamela again traveled to Mississippi on that date. At the hearing, Pamela, her mother, Charles Graham, and a friend of Pamela's, Melba Holt, testified. After hearing the testimony, Judge Cortright told the parties that he felt that they could reach an agreement rather than going on with the trial, since child support was the only issue.
All parties agreed that Culpepper and Pamela were in one room in the courthouse and that Charles Graham and Mark Prewitt were in another room during the negotiations for the settlement. The attorneys would talk to their clients and then meet in the hall to exchange terms. Finally, the parties reached an agreement and returned to the courtroom.
Pamela discussed the terms of the settlement with Culpepper. She agreed that she would receive $400 a month in child support for one year. As of July 1, 1988, the support would increase by $50 a month. The parties would try to sell their house in six months. Whether or not it sold within six months, Charles would pay Pamela a monetary settlement of $4,500 in three months.
Culpepper told Prewitt that he could state the agreement in court. Pamela testified that as Prewitt recited the terms, she noticed that some of them were different than what she had agreed to previously. She pointed out the differences to Culpepper but he told Pamela not to worry, that this was just a formality. He said they would go to his office and draw up an agreement containing the terms to which she had agreed. He said he would send the drafted agreement to Prewitt, and Prewitt and Charles would sign the corrected version since they knew that's what the agreement was.
Charles Graham testified that the correct agreement was the one which was read into the record and that is what he agreed to during the negotiations. In that agreement, *418 Pamela would receive the sum of $400 a month for two years, until July 1, 1989, instead of one year before it would be raised by $50 a month. Also, Charles would have six months to pay the $4,500 to Pamela instead of three months. Charles said the parties met in the hallway after the negotiations and everyone agreed on the terms of the settlement. His attorney, however, said that the parties went straight to the courtroom and did not meet in the hallway, as far as he could remember.
When Prewitt read the agreement into the record, no objection was made. Judge Cortright did not see anyone indicate dissatisfaction during the reading of the agreement into the record.
Pamela's testimony is supported by the fact that she did return to the office of Culpepper and sign an agreement and judgment before returning to Missouri, which included the terms which she said she had agreed to during the negotiations. Pamela first testified that she returned that same day, June 24, 1987, to sign the agreement. However, Culpepper says she returned the next day. Pamela agreed that it might have been the next day.
Pamela wanted to have the agreement drafted right away so that Prewitt and Charles could go ahead and sign it immediately, which is why she thought she had gone to Culpepper's office that same day. However, she said that Culpepper told her that he would have to remind Prewitt of the differences and that it would be better if he sent the agreement to Prewitt.
Culpepper said that Pamela came into his office the day after the trial, June 25, 1987, and told him that she had seen Charles after the trial and that Charles had agreed to some changes in the terms of the agreement. That is why Culpepper allowed the terms to be changed from what was read into the record at trial. He said he tried to call Prewitt but could not reach him.
Pamela's testimony is more believable than is Culpepper's. Culpepper actually drafted an agreement which included the terms to which she agreed during the negotiations. Culpepper's testimony is that he made changes in the agreement on only his client's say so. He said that he could not reach Prewitt. However, Culpepper does not indicate that he left a message or tried to return the call later. Prewitt did not become aware of the changes until he noticed them as he was going through the agreement sent to him by Culpepper. The evidence is clear and convincing that Culpepper failed to communicate to Pamela the true basis of the settlement reached between the attorneys and that he failed to communicate to the court his client's true agreement.

V.
Culpepper also takes issue with the last two findings made by the Complaint Tribunal. Those findings are that Culpepper failed to advise Pamela that the agreement being filed at the time of the judgment was not the same nor in conformity with her signed agreement of June 25, 1987, and that Culpepper presented a judgment and accompanying agreement to the court on the representation that all parties had agreed to it knowing, in fact, that the representation was not true.
After Pamela had signed the agreement in Culpepper's office, she returned to Missouri. The judge had set July 1, 1987, as the date when the judgment was to be entered. When Pamela did not hear from Culpepper on or immediately after that date, she wondered why it was taking Prewitt and Charles so long to sign the agreement. She called Culpepper's office several times to find out what the problem was. Culpepper kept telling her that he had not received the agreement back yet.
Culpepper sent a copy of the proposed agreement to Prewitt. After reviewing the agreement, Prewitt called Culpepper about the changes that had been made in the terms of the agreement. Prewitt told Culpepper that the version of the agreement which was read into the record was the only version his client would accept. Culpepper authorized Prewitt to change the agreement. Culpepper said that he told Prewitt that their clients had agreed to the changes, but Prewitt told him that his *419 client was going to stick with what had been agreed on at the hearing.
When Charles Graham met with his attorney, Prewitt pointed out the differences in the agreement. Prewitt had his secretary retype the agreement so that it read as the parties had originally agreed. Charles and Prewitt then signed the agreement.
Culpepper testified that he talked with Pamela soon after he had talked to Prewitt. He said that he told Pamela that Charles would not agree to the changes and that he would send the changed version to Pamela. Culpepper said that Pamela was angry but she was in such desperate straits that she agreed to them.
Charles Graham hand-delivered the re-typed agreement to Culpepper, along with a letter from Prewitt dated July 3, 1987. Prewitt called Culpepper several times to ask about the agreement because he did not hear anything from Culpepper for awhile. Culpepper told Prewitt that he had talked to Pamela and that she was in the process of returning the agreement to him. Culpepper said that he contacted Pamela when Prewitt called him, and she told him that she would be putting the agreement in the mail. Culpepper said that he received the agreement from Pamela around July 11 or 12, 1987.
The record includes a letter written from Pamela to Culpepper dated July 15, 1987. Culpepper said he received the letter. In it, Pamela said that she was anxious to receive the divorce decree and that she had tried calling Culpepper several times, but he was not in the office. Culpepper said he talked to Pamela after receiving this letter. They talked about selling the house and about the other questions which she had posed in her letter.
Culpepper presented the agreement and judgment to Judge Cortright on July 24, 1987, which he normally does when the other side is represented by an out-of-town attorney. Judge Cortright looked at the agreement, saw the parties had signed it, and then signed it himself. He also signed the judgment after inserting the words "on the ground of habitual cruel and inhuman treatment" on the second page.
Culpepper called Pamela that day to tell her that the divorce was final and that he was sending her a copy of the judgment that day. Culpepper said he sent her a copy but it was not certified since that process takes three or four days.
Pamela had not received a copy by July 30th, so she called Culpepper's office and talked to the secretary. Culpepper was not in the office so Pamela asked the secretary to read the judgment to Pamela over the phone. The secretary left the phone and when she returned, she told Pamela that Culpepper had the file with him.
Pamela called the chancery clerk's office. She had a clerk read the judgment to her over the phone. During the reading of the judgment, Pamela noticed that the agreement was different than the agreement which she had signed. Pamela then received a call from Culpepper, and she asked him to read the agreement to her which had been signed by Judge Cortright. Culpepper started reading the agreement which had been signed by Pamela in his office after the settlement had been reached in court. Pamela asked him if he was sure that the Judge had signed that agreement. Culpepper asked her why she thought there was a difference. Pamela told him that she had a clerk read the agreement to her and it was different. That Pamela called the chancery clerk's office is supported by a call on Pamela's telephone bill to the clerk's office which lasted for seventeen minutes. Culpepper told her that he was not aware of any difference but he would check and then call her.
Pamela received a certified copy of the agreement from the clerk's office. She also received a certified copy from Charles Graham when he arrived to pick up Jeanna. When she discovered that the agreement and judgment were different than what she had agreed to, she called Culpepper and asked him what could be done. Pamela said Culpepper told her that the differences had slipped by his office and he apologized. He told her that he would make up the *420 difference in child support and he would give her $4,500 in three months.
Pamela wrote to Culpepper on August 12, 1987. She asked that he meet the requirements by August 24, 1987. Pamela said that she wrote this letter in order to get a response from Culpepper because she had not heard from him.
Pamela said that she did not sign the agreement which was approved by the court even though what was purportedly her signature appeared on the document. Culpepper denied that he signed Pamela Graham's name to the agreement.
A. Frank Hicks, a forensic document examiner, examined the signature on the agreement which was signed by Judge Cortright on July 24, 1987. He compared it to the signature of Pamela Graham as signed on twenty-six legal sheets and eight of her signatures on various pleadings in the court file. He also examined twenty-four index cards which contained the name of Pamela Graham as signed by Culpepper. He determined that the signature on the agreement displayed a great deal of tremor and had a slow writing speed with great pen pressure. He found some basic differences between the signature and that of Pamela Graham. It was his opinion that the signature was either a tracing or simulation which did not lend itself to an identification of the writer.
The exhibits introduced into evidence at the hearing include a judgment obtained from the file of Culpepper. The judgment has the date of July 1, 1988, as the date when support would be increased rather than the date of July 1, 1989, the date which is in the judgment signed by Judge Cortright. Also, the language written in by Judge Cortright on page two is missing from the judgment found in Culpepper's file. However, the document contains the purported signature of Judge Cortright. When presented with this document, Culpepper first said that he must have had a copy made of the judgment before the Judge inserted the language on page two. Later, Culpepper said he had no idea how the document got into his file. He said it must have been included in some correspondence he received from Pamela. A copy of this same document was also in Prewitt's file and he said that he believed he had received it from Culpepper.
Culpepper's testimony is less than believable. A handwriting expert testified that in his opinion, the signature of Pamela Graham on the judgment that was entered was a simulation or tracing. Culpepper claims that there was no motive on his part to perform such an act, but there was no motive on the part of Pamela Graham. His argument is less than persuasive. The evidence is clear and convincing that Culpepper failed to advise Pamela that the agreement being filed at the time of judgment was not the same as her agreement of June 25, 1987. He authorized Prewitt to make the changes without first consulting Pamela. Since that is true, the evidence is clear and convincing that Culpepper presented the agreement and judgment to the court knowing that all parties had not agreed to the terms.

VI.
This Court's de novo review of an attorney disciplinary matter includes a review of the sanctions. Myers v. Mississippi State Bar, 480 So.2d 1080, 1089 (Miss. 1985). The sanctions imposed by this Court may be more or less severe than those which the Complaint Tribunal has recommended. Steighner v. Mississippi State Bar, 548 So.2d 1294, 1297 (Miss. 1989).
When an attorney is subject to disciplinary measures, five factors will be considered in determining the severity of the sanctions, although the list is not all-inclusive. The factors are:
(A) Nature of the misconduct involved;
(B) Need to deter similar misconduct;
(C) Preservation of dignity and reputation of the legal profession;
(D) Protection of the public; and
(E) Sanctions imposed in similar cases.
Fougerousse v. Mississippi State Bar Association, 563 So.2d 1363, 1366 (Miss. 1990).
This Court will not hesitate to impose "substantial sanctions when an attorney's *421 act evinces want of personal honesty and integrity or renders such attorney unworthy of public confidence." Mississippi State Bar v. Odom, 566 So.2d 712, 715 (Miss. 1990); Foote v. Mississippi State Bar Association, 517 So.2d 561, 564 (Miss. 1987). Prior disciplinary offenses of the attorney will be considered as an aggravating factor. Foote, 517 So.2d at 565 (citing ABA, Standards for Imposing Lawyer Sanctions, Standard 9.22(a) (1986)).
The purpose of imposing sanctions is not punitive. Rather, sanctions are imposed as a means of protecting the public and deterring similar misconduct. Mississippi State Bar Association v. A Mississippi Attorney, 489 So.2d 1081, 1084 (Miss. 1986).
Culpepper has been sanctioned previously in Mississippi State Bar v. Charles L. Culpepper. The decision rendered by the Complaint Tribunal on December 19, 1986, was not appealed. In that case, Culpepper's misconduct was similar to his misconduct in this case.
In March of 1984, Culpepper represented Thomas Harvey in his divorce proceedings. During the course of those proceedings, Culpepper represented to the judge that his client had agreed to a settlement, was aware of a trial setting, and had refused to follow through with the settlement because of information his client had received bearing on the welfare of his children. In truth, Harvey had not agreed to the settlement, did not know of the trial setting, and had not been informed of the contents of the agreement. Furthermore, Culpepper had represented to Mrs. Harvey's attorney that Culpepper had the permission of his client to agree to a settlement of the issues when in fact, he did not have his client's permission.
The Complaint Tribunal in that case found that Culpepper had violated DR1-102(A)(4, 5, and 6), DR7-102(A)(3, 4, and 5), § 73-3-35, and § 73-3-37. The Tribunal suspended Culpepper from practice for one year but, in turn, suspended the one year suspension. Culpepper was put on probation for two years with the condition that he not violate any of the disciplinary rules. In imposing sanctions, the Tribunal took into consideration Culpepper's contriteness and his assurances that such conduct would not reoccur.
Culpepper contends that his client, Pamela Graham, was not injured and that she received everything for which she asked. Even if that were true, it does not diminish the fact that Culpepper acted deceitfully. He misled his client throughout the proceedings and then attempted to cover up his misconduct. Furthermore, he misrepresented to the court that his client had agreed to terms which she in fact did not agree to, and he presented a document to the court containing a signature which was not hers.
Even worse, Culpepper denies all allegations and attempts to shift the blame to his client. Culpepper's misconduct in this instance, when combined with his previous misconduct, demonstrates that Culpepper is unfit to practice law. His conduct evinces a want of personal honesty and integrity and renders him unworthy of public confidence. Not only has Culpepper shown a pattern of dishonesty in his dealings with his clients, his conduct can only be said to be harmful to his clients. Culpepper has violated DR1-102(A)(4, 5, and 6) and DR7-101(A)(1, 2, and 3) of the Code of Professional Conduct; Rules 1.2(a), 3.3(a)(1 and 4), 3.4(a and b), and 8.4 (c and d) of the Rules of Professional Conduct; and Miss. Code Ann. § 73-3-35, the oath of attorneys. We order that Charles L. Culpepper be disbarred from the practice of law.
COMPLAINT TRIBUNAL'S FINDING FOR DISCIPLINARY ACTION AFFIRMED; COMPLAINT TRIBUNAL'S THREE-YEAR SUSPENSION REVERSED, AND DISBARMENT ORDERED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., ROBERTSON, PITTMAN and BANKS, JJ., concur.
McRAE, J. and DAN M. LEE, P.J., dissent.
PRATHER, J., not participating.
*422 McRAE, Justice, dissenting:
This is a quasi-criminal proceeding, wherein an experienced tribunal, consisting of a Circuit Judge and two lawyers appointed by this Court, recommended that Culpepper be suspended for three years. The tribunal who heard this case saw the witnesses, observed their demeanor, saw the defendant and his demeanor, heard and applied the facts to the law and made their decision based on it. We did not. With any other professional group involved in similar proceedings, we have either affirmed or remanded for further review by their "tribunal" or hearing agency. This is the only professional group that does not enjoy that privilege. Our constitution requires due process and a trial by peers. See Miss.Const., art. III, §§ 14 and 22.
In view of the above, I would affirm the tribunal.
DAN M. LEE, P.J., joins this dissent.
NOTES
[1] The Mississippi Rules of Professional Conduct, effective July 1, 1987, have replaced the disciplinary rules contained in the Code of Professional Responsibility. Culpepper represented Pamela Graham from February to August of 1987.