# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2001-BA-00988-SCT

*THE MISSISSIPPI BAR*
*v.*
*JOE PRICE COLEMAN a/k/a J. PRICE COLEMAN*

| | |
|---|---|
| DATE OF JUDGMENT: | 6/7/2001 |
| TRIAL JUDGE: | HON. JAMES H. C. THOMAS, JR. |
| COURT FROM WHICH APPEALED: | COMPLAINT TRIBUNAL |
| ATTORNEYS FOR APPELLANT: | MICHAEL B. MARTZ |
| | J. DAVID WYNNE |
| ATTORNEYS FOR APPELLEE: | ALEX A. ALSTON, JR. |
| | DAVID W. DOGAN |
| NATURE OF THE CASE: | CIVIL - BAR MATTERS |
| DISPOSITION: | JOE PRICE COLEMAN IS SUSPENDED FROM PRACTICING LAW IN THE STATE OF MISSISSIPPI FOR THREE (3) YEARS- 12/12/2002 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**McRAE, PRESIDING JUSTICE, FOR THE COURT:**

¶1.   Attorney Joe Price Coleman was charged with commingling, misappropriation and conversion of client funds in violation of Rules 1.15 and 8.4 (a, c, and d) of the Mississippi Rules of Professional Conduct. The Complaint Tribunal (Tribunal) found a Rule 1.15 violation only and suspended Coleman from the practice of law for thirty (30) days and ordered that he receive a public reprimand.  Both the Mississippi Bar (the Bar) and Coleman appeal.

¶2.  We affirm as to Rule 1.15, but reverse as to Rules 8.4(a, c, and d) and therefore order that Coleman is suspended from the practice of law for three (3) years.

## STATEMENT OF THE CASE

¶3. The Bar brought a complaint against Coleman alleging violation of Rules 1.15 and 8.4 (a), (c), and (d) of the Rules Professional of Conduct.  In response, Coleman moved to dismiss or in the alternative for summary judgment on the basis that the Complaint Committee (Committee) heard the matter in violation of the Mississippi Rules of Discipline, which require that any complaint considered by the Committee must first be in writing.  His motion was denied. A hearing followed.  The Committee found that Coleman violated Rule 1.15 , but not Rules 8.4 (a), (c), and (d).  He was suspended from practice for thirty days, and ordered to receive a public reprimand.

¶4. The Bar asserts that the Tribunal erred in failing to find, in addition to the Rule 1.15 violation, that Coleman misappropriated and converted those commingled client funds for his own personal use in violation of  Rules 8.4 (a), (c), and (d).   The Bar asserts this decision is arbitrary and capricious as it is against the overwhelming weight of the evidence presented.

¶5. Coleman asserts on cross-appeal that (1) the Tribunal's actions are void for lack of authority because the complaint against him was considered without a written complaint; (2) a reprimand or an admonition is appropriate; and (3) Rules 8.4 (a), (c), and (d) are inapplicable because: (1) double jeopardy results when applied in conjunction with Rule 1.15; (2) his conduct was not dishonest or fraudulent; and (3) there was no legal proceeding with which his conduct could interfere, thus precluding  any liability outside of Rule 1.15.

¶6. The facts of this case arose during Jackson attorney Joe Price Coleman's change of employment from the law firm of Daniel Coker Horton & Bell, P.A. (Daniel Coker) to the Baker, Donelson, Bearman & Caldwell, P.C. (Baker Donelson) law firm. On March 24, 2000, Coleman, as administrator of the Arkansas Shared Counsel Defense Fund (Fund), which was administered by Daniel Coker, wrote and signed a check in the amount of $14,904.94 payable to the Fund, which he signed and then deposited into his personal checking account on March 28, 2000. The purpose of the draft was to move the proceeds of that account to the Mississippi Hearing Loss Joint Defense Fund of which Raymond Brown was administrator. Coleman claims he intended to deliver the funds to Raymond Brown the following week, but that opportunities to do so in a timely manner were impeded by other responsibilities, deadlines, travel, and by the process of changing firms. Additionally, Coleman claims he was concerned that Daniel Coker would cancel the check since many of the Fund clients had not formally transferred their files to Coleman's new firm.

¶7. Seventy-two (72) checks were written from Coleman's personal bank account between the time the deposit was made and the time the money was finally delivered to Raymond Brown. Most of these were written by Mrs. Coleman. Again, at the time of deposit, the Colemans' account had a negative balance of over $12,000. Coleman's Banker testified that it was not unusual for Coleman's account to be in over-draft and that no consequence would have ever resulted, as the Colemans maintained overdraft protection. He also testified that no check ever went unpaid by the bank.

¶8. Coleman finally delivered the money to Raymond Brown on May 1, 2000. On the very same day, Daniel Coker mailed a letter to Coleman regarding the money and requesting that

3

he call the Firm. The letter was received at Coleman's new firm on May 2. On May 3, 2000, Coleman called Daniel Coker and reported that the money had been transferred to Raymond Brown. Because the funds had been placed in Coleman's personal account, however, Daniel Coker expressed its responsibility to report the matter to the Bar. Coleman desired to participate in the report and acting jointly with Daniel Coker reported the matter to the Bar. Daniel Coker never filed a written complaint.

¶9. Following Daniel Coker's oral report, Complaint Counsel for the Bar drafted a "Memorandum to the Committee" (Memo) dated May 24, 2000, summarizing the results of his investigation into the matter. The memo was entitled "Commingling and Misappropriation of Funds." In the Memo, Complaint Counsel recommended that, in the absence of a written complaint, "an Information and Belief Complaint" should be filed against Coleman. The Committee considered the matter at a regularly conducted meeting on June 15, 2000. At this time, no written complaint, either formal, informal, by a third-party complainant or one based upon Complaint Counsel's information and belief had been made. Coleman's counsel requested a record of this proceeding, but was refused on the basis of confidentiality and privilege. Neither Coleman nor his attorney were ever informed of the Memo, or that the Committee would consider the matter on the basis of the Memo. They did not learn of the Memo until the middle of the hearing on Coleman's motion to dismiss. However, both Coleman and his attorney were informed of the process Complaint Counsel would follow, including his talk before the Committee prior to the filing of a written complaint.

¶10. On June 23, 2000, the Complaint Counsel, based "on information and belief and at the direction of the Committee on Professional Responsibility," filed an "Information and Belief" Complaint against Coleman as the Complainant. By letter dated September 15, 2000, and addressed to Complaint Counsel, the Committee determined there was probable cause to believe that Coleman engaged in misconduct. The Committee directed Complaint Counsel to "prepare and file a Formal Complaint Against J. Price Coleman in accordance with the provisions of Rule 8 of the Rules of Discipline for the Mississippi Bar." The Complaint was filed on September 25, 2000.

¶11. Coleman moved to dismiss the case, or in the alternative for summary judgment on the basis that the Complaint Committee considered the matter without a written complaint, as prescribed by the Rules, and was therefore without the ability to dismiss the cause or admonish the attorney at that time, since it may not act except upon a "written complaint." The motion was denied. The matter was heard on the merits.

## STANDARD OF REVIEW

¶12. The standard of review in this matter is de novo. *Cotton v. Miss. Bar,* 809 So.2d 582, 585 (Miss. 2000). This Court has "exclusive jurisdiction and inherent jurisdiction of matters pertaining to attorney discipline." *Broome v. Miss. Bar,* 603 So.2d 349, 354 (Miss. 1992). This Court sits as the trier of fact and is not bound by a substantial evidence or manifest error

rule. *Asher v. Miss. Bar*, 661 So.2d 722, 727 (Miss. 1995). However, deference is given to the Tribunal's findings on the basis that it was the exclusive trier of credibility and demeanor, which cannot be duplicated on appeal to this Court. *Stegall v. Miss. Bar*, 618 So. 2d 1291,1294 (Miss. 1993).

## DISCUSSION

I. **WHETHER THE TRIBUNAL'S ACTIONS ARE VOID BECAUSE THE COMPLAINT COMMITTEE CONSIDERED THE MATTER WITHOUT A WRITTEN COMPLAINT.**

¶13. Coleman asserts that this matter was considered in violation of disciplinary procedure and that, as a result, he was prejudiced. He also asserts that the procedure employed violates the equal protection clause of the Fourteenth Amendment and the Mississippi Constitution. Therefore, he argues that this Court should dismiss the case. We disagree.

### *Procedure*

¶14. The Rules of Discipline for the Mississippi Bar set forth the procedure for the investigation and prosecution of attorney misconduct. They read in relevant part:

**Rule 4. INITIATION AND FILING OF COMPLAINTS**

> **(a)** Any matter touching on the misconduct of an attorney licensed in the State of Mississippi or any attorney who renders or has rendered legal services in this state shall be called to the attention of Complaint Counsel *either verbally or in writing...*

> **(c)** The *Committee on Complaints shall not* consider the matter *until it has been reduced to writing. . .*

Miss. R. Disc. 4. The Rules also enumerate in detail what the written complaint *shall* contain, including the name and address of the complainant, the name and address of the accused attorney, a statement of the facts of the complaint, a list of witnesses, and copies of

6

any statement by witnesses. *Id.* 4.2 (a)-(e). Further, Rules 5 and 7 outline the required complaint procedure:

### Rule 5.  COMPLAINT COUNSEL - DUTIES AND POWERS

The Complaint Counsel shall investigate complaints, prosecute formal complaints, and discharge other duties assigned by the Board of Commissioners. Complaint Counsel shall conduct any investigation or investigatory hearing fairly and impartially and shall seek to elicit any and all facts which might be exculpatory or incriminatory of the accused attorney.  All proceedings under these rules shall be expeditiously conducted to the end that no complainant be deprived of his right to a timely, fair and proper investigation of a complaint and that no attorney be subjected to unfair and unjust charges.

**(5.1) General.**  *Upon receipt of a written complaint or information* indicating probable cause, Complaint Counsel shall conduct an investigation. . .Complaint Counsel *may* require a complaint to be in writing *or may* file a complaint on *information and belief.*

**(5.2) Investigations and Reports.** Complaint Counsel shall investigate and report to the Committee on Professional Responsibility within sixty days from *receipt of the written complaint. . . .*

**(5.8) The Investigatory Hearing.**  After *written notice of the complaint* or investigation is given to the attorney, such attorney or counsel therfor shall have the right to appear at any investigatory hearing for the purposes of examining or cross-examining all witnesses and for presenting witnesses and evidence on behalf  of the attorney. . .

### Rule 7. COMMITTEE ON PROFESSIONAL RESPONSIBILITY DUTIES AND POWERS . . .

**(7.3) Formal Complaints.** If, after conclusion of the investigation, the Committee is of the opinion that probable cause exists to believe the attorney is guilty of conduct warranting discipline, the matter shall be referred to Complaint Counsel for filing of a Formal Complaint for trial before a Complaint Tribunal.

¶15. In the present case, Complaint Counsel prepared an "information and belief" complaint *after* the matter had been considered by the Committee on the basis of a Memo. Coleman's counsel first saw the Memo during the hearing before the Tribunal on Coleman's motion to dismiss, when Complaint Counsel first argued that it, and not a complaint, could serve as the required writing.

¶16. The applicable Rule is written as a mandate: *"The Committee on Complaints shall not consider the matter until it has been reduced to writing. . ."* Miss. R. Disc. 4. Neither do the Rules allow Complaint Counsel the option of acting before the committee in the absence of a written complaint. *Id.* 5.1. Instead, they require counsel to conduct an investigation only "upon receipt of a written complaint or information indicating probable cause." *Id.* Complaint Counsel then has 60 days "from receipt of the written complaint" to report to the Committee. *Id.* 5.2.

¶17. In *Mississippi Bar v. Attorney G.,* 630 So.2d 344 (Miss.1994), this Court held that it is bound by its own disciplinary rules. The Court announced that:

> Attorney disbarment and suspension cases are quasi-criminal in character. *In the Matter of Richard A. Thalheim, Jr., Plaintiff-Appellant,* 853 F.2d 383 (5th Cir.1988), Accordingly, the court's disciplinary rules are to be read strictly, resolving any ambiguity in favor of the person charged. *Id.* at 388. [citations omitted.] The above case further states that: When a court undertakes to sanction an attorney for violating court rules, it is incumbent upon the sanctioning court to observe scrupulously its own disciplinary procedure. If the rules are inadequate, the court can proceed to amend them. But unless and until such amendment occurs, attorneys have the right to rely upon the rules. *Id.* at 390.

*Attorney G.,* 630 So.2d at 348.

¶18. We emphasize the above case and instruct Complaint Counsel and the Bar to endeavor committing its principle to memory. As to the present facts, however, Coleman was fully informed, in advance, of each step Complaint Counsel took outside of prescribed procedure, including Counsel's appearance before the Committee prior to the filing of a written complaint. There was complete cooperation and candor throughout the process on both sides. Coleman was also informed of when and how Complaint Counsel was going to present the matter from the outset. As such, we find that Coleman waived his procedural argument and was not prejudiced by the procedural deviations from the rules.

¶19. Coleman also argues that the Complaint Counsel's use of two methods, the "oral report/information and belief method" and the "written complaint" method, results in unconstitutional classifications of accused attorneys, with one group receiving less due process than the other, the other receiving more. For the same reasons we have discussed above, we find that this has no merit.

## II. WHETHER MULTIPLE RULE APPLICATIONS TO THE SAME CONDUCT TRIGGERS DOUBLE JEOPARDY.

¶20. Coleman suggests that findings of multiple Rule violations resulting from a single offense constitutes double jeopardy. This argument is without merit.

¶21. The double jeopardy clause protects against (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. The latter of these is at issue in the present appeal.

¶22. This issue was recently considered by one of our sister Courts, the Supreme Court of

South Carolina. ***In re Chastain,*** 532 S.E.2d 264 (S.C. 2000). The issue was whether a lawyer

who has been sanctioned under the disciplinary rules for improperly failing to return a

retainer can be sanctioned a second time under the rules after he is convicted of a criminal

charge stemming from his initial rule violation. ***Id.*** The attorney argued that it would violate

the Double Jeopardy Clause to sanction him a second time for the same offense.  Citing this

Court's holding in ***Mississippi State Bar v. Young***, 509 So. 2d 210, 212 (Miss. 1987), the

South Carolina Supreme Court recognized that states classify disciplinary proceedings in one

of three ways, either civil, special, or quasi-criminal.   "Regardless of the exact label,"

however, "courts uniformly have concluded that the Double Jeopardy Clause is not

implicated in disciplinary proceedings." ***Id.***  The South Carolina Supreme Court relied in

great measure on a persuasive analysis by the Seventh Circuit:

> [I]t would be well to note that disbarment and suspension proceedings are neither civil nor criminal in nature but are special proceedings, *suie generis*, and result from the inherent power of courts over their officers. Such proceedings are not lawsuits between parties litigant but rather are in the nature of an inquest or inquiry as to the conduct of the respondent.  They are not for the purpose of punishment, but rather seek to determine the fitness of an officer of the court to continue in that capacity and to protect the courts and the public from the official ministration of person unfit to practice.  Thus the real question at issue in a disbarment proceeding is the public interest and an attorney's right to continue to practice a profession imbued with public trust.

***Id***. (citing ***In re Echeles,*** 430 F.2d 347, 349-50 (7ᵗʰ Cir. 1970)).  *See also* ***Fitzsimmons v.***

***State Bar***,  667 P.2d 700, 703 (Cal.1983)(although afforded great measure of due process,

disciplinary proceedings do not extend to attorneys the extent of due process afforded a

criminal defendant because such proceedings are sui generis as opposed to purely criminal

or purely civil)                      .

¶23.   The case law, in this jurisdiction and others, could not be clearer.  Double jeopardy

is triggered *only* in a criminal setting, and as such is inapplicable to disciplinary proceedings.

Mississippi Bar disciplinary actions, although deemed quasi-criminal, are not criminal

proceedings.  The primary purpose of disciplinary proceedings is not to punish an attorney

for misconduct, but rather to protect the public and preserve the integrity of the Bar.  For

these reasons, Coleman's  double jeopardy claim is without merit.

**III**.   **WHETHER   THE COMPLAINT TRIBUNAL ERRED IN FAILING TO FIND COLEMAN IN VIOLATION OF RULES 8.4 (a, c, and d); AND IF SO, THEREFORE IMPOSED INADEQUATE SANCTIONS.**

¶24.   The Bar asserts that the Tribunal, despite clear and convincing evidence, failed to find

that Coleman also violated Rule 8.4 (a, c and e) in addition to Rule 1.15.  These Rules read

as follows:

> **Rule 1.15 Safekeeping Property.**
> **(a)** A lawyer *shall* hold property of clients or third persons that is in a lawyer's possession in connection with a representation *separate from the lawyer's own property. . .*
>
> **Rule 8.4. Misconduct.**
> It is professional misconduct for a lawyer to:

**(a)** violate or attempt to violate the rules of professional conduct, knowingly assist or induce another to do so, or do so through the acts of another. . .

**(c)** engage in conduct involving dishonesty, fraud, deceit, or misrepresentation;

**(d)** engage in conduct that is prejudicial to the administration of justice.

¶25. In assessing disciplinary violations, this Court considers: (1) the nature of the misconduct involved; (2) the need to deter similar misconduct; (3) the preservation of the dignity and reputation of the profession; (4) the protection of the public; (5) the sanctions imposed in similar cases; (6) the duty violated; (7) the lawyer's mental state; (8) the actual or potential injury resulting from the misconduct; and (9) the existence of aggravating or mitigating factors. *Miss. Bar v. Walls*, 797 So.2d 217, 219 (Miss. 2001) (citing *Rogers v. Miss. Bar,* 731 So.2d 1158, 1171 (Miss. 1999)). "Worthy of most consideration when contemplating sanctions is vindicating 'in the eyes of the public the overall reputation of the bar.'" *Id.* (quoting *Hall v. Miss. Bar,* 631 So.2d 120, 125 (Miss.1993)).

### *The duty violated*
### *The nature of the misconduct involved*

¶26. Commingling of client funds is the "cardinal sin" of the legal profession, whether done intentionally or not. *Haimes v. Miss. Bar,* 601 So.2d 851, 854 (Miss. 1992). *See also Miss. Bar v. Cotton,* 809 So. 2d 582, 587 (Miss. 2000); *Miss. Bar v. Gardner,* 730 So.2d 546, 547 (Miss. 1999); *Reid v. Miss. State Bar,* 586 So.2d 786 (Miss. 1991). In many cases,

12

it has been grounds for disbarment or denial of reinstatement.  It is indeed the ultimate breach of fiduciary trust.[1]

¶27.   In the present case, the Tribunal found that Coleman unquestionably commingled client funds in violation of Rule 1.15.  Indeed, Coleman admitted as much. Coleman testified, however, that he never intended to keep the money or convert it for his own personal use.  Instead, he claimed that his job transition, the possible threat of Daniel Coker keeping the money, and his burdened schedule contributed to the delay in delivering the funds.

¶28.   On the issue of intent, the Tribunal found that while Coleman could have "easily endorsed the Daniel Coker check to Raymond Brown, written his own personal check to Raymond Brown and promptly mailed either, or made a special trip" to deliver the funds, "there was no clear showing" that his actions demonstrated intent to  misappropriate or convert the funds for his own use. We do not agree.

¶29.   In *Reid v. Miss. State Bar*, 586 So. 2d 786, 788 (Miss. 1991), we found that:

> When a lawyer receives and deposits in his trust account funds belonging to others, and prior to disbursing any of such funds to the lawful payees, the trust account shows a total deposit less than the amount he had been entrusted with, this supports the conclusion that the attorney has converted funds to an unauthorized and unlawful use. *Jackson v. State Bar*, 25 Cal.3d 398, 158 Cal.Rptr. 869, 600 P.2d 1326 (1979); *Giovanazzi v. State Bar of California*, 28 Cal.3d 465, 169 Cal.Rptr. 581, 619 P.2d 1005 (1980).

---

[1]The distinction between commingling and, for example, mishandling one's own financial affairs – that may lead to, say, tax evasion –  is that commingling is the inappropriate use of *someone else's* money.

¶30.    We find *Reid* instructive in the present case. Coleman personally wrote the fund check out to himself and deposited it into his personal checking account.  Coleman also knew for five weeks that the client's  money was in his personal account.  He and his wife presented seventy-two checks on this personal account over the period of that five weeks which were paid in large measure from the clients' money. This is simply unacceptable.

### *The need to deter similar misconduct*

### *The preservation of the dignity and reputation of the profession*

### *The protection of the public*

¶31. This Court has repeatedly held that the primary purposes of Bar discipline are deterrence of  future misconduct and the preservation of the legal profession's reputation in the eyes of the public.  *See, e.g., Cotton*, 809 So. 2d at 587. *See also Miss. State Bar Ass'n v. A Miss. Attorney,* 489 So.2d 1081, 1084 (Miss.1986); *Phillips v. Miss. State Bar,* 427 So.2d 1380, 1382 (Miss.1983).

¶32.    This Court has observed that:

> There can be no legal *profession* in the absence of scrupulous honesty by attorneys with other people's money. Public confidence here is vital. There may be worse sins, but the ultimate wrong of a lawyer to his profession is to divert clients' and third parties' funds entrusted to him to an unauthorized use. A lawyer guilty of such conduct exhibits a character trait totally at odds with the purposes, ideals and objectives of our profession.

*Reid,* 586 So. 2d at 788.   We also said in this case,  " [t] here can be no more damaging evidence . . . as to a lawyer's fitness to practice law than mishandling a trust account." *Id.*

14

Further, "[t]here may be worse sins, but the ultimate wrong of a lawyer to his profession is to divert clients' and third parties' funds entrusted to him to an unauthorized use. A lawyer guilty of such conduct exhibits a character trait totally at odds with the purposes, ideals and objectives of our profession." *Id.*

¶33.    Indeed, the viability of the legal *profession* hinges upon the conservation of its character, a primary component of which is trust, an additional component of which is consistent and responsible self-regulation.  No force of deterrence or public trust is served by inconsistent regulation. Discipline should be rendered consistently, and it should be maintained in order to satisfy disciplinary purposes.  A thirty-day suspension on the facts of the present case fails to serve these purposes.

### *The lawyer's mental state*

¶34.    Coleman's mental state is not at issue in this case.

### *The existence of aggravating or mitigating factors*

### *The actual or potential injury resulting from the misconduct*

¶35.    Coleman finally returned the money to appropriate hands, which mitigates in his favor.  *See **Miss. Bar v. Gardner,*** 730 So.2d 546, 547 (Miss. 1998) (repayment is a mitigating factor). Likewise, Coleman both initiated this proceeding with the Daniel Coker representatives and cooperated throughout the entire matter.   With the exception of this

incident, the record reveals that Coleman's professional reputation is without blemish. He has been practicing for over 25 years and has not previously been charged with a disciplinary violation. Notably, he served on the Bar committee that facilitated the transfer from the Code of Professional Responsibility to the Rules of Professional Conduct. According to testimony before the tribunal, he is known as the kind of attorney an adversary can deal with on a handshake. These are all mitigating factors, but they cannot and do not aid Coleman in avoiding disciplinary action on these facts. In fact, he is the kind of attorney from whom we would naturally expect the highest regard for professional responsibility.

¶36. As to aggravating circumstances, the record is not revealing. Nor does it reveal any injury to third-parties as a result of Coleman's personal use of the commingled funds.

### Sanctions imposed in similar cases

¶37. The Tribunal reasoned that this case is most factually in line with our decision in *Mississippi Bar v. Pels,* 708 So.2d 1372 (Miss. 1998)**,** as opposed to other of our decisions where commingling was coupled with patent and flagrant abuses of trust. *See, e.g.,***Gex v. Miss. Bar**, 656 So.2d 1124, 1125-26 (Miss. 1995) (attorney misrepresented his authority to cancel deed of trust in return for payoff when in fact he had assigned his interest in the deed to a third party; he then received and used the payoff funds for personal expenses); *Haimes v. Miss. Bar,* 601 So.2d 851, 852-53 (Miss.1992) (attorney transferred $5000.00 belonging to guardianship of incompetent to personal account and paid himself unauthorized "fees" for services rendered); *Clark v. Miss. State Bar Ass'n*, 471 So.2d 352, 354 (Miss.1985) (attorney withdrew and spent funds from conservatorship's savings account then filed reports

16

reflecting balance in account when no account existed). We do not agree. We have rarely treated commingling and conversion cases lightly.[2]

¶38.    In *Pels,* we determined that Pels had not engaged in a systematic diversion of his client's funds for personal purposes. *Pels,* 708 So.2d 1372 (attorney suspended for thirty days for negligently commingling client funds). The money at issue in *Pels* was placed into an account used for *both* Pels's business and personal finances. And within days of receiving the funds at issue, Pels sent his client the full amount to which she was potentially entitled under the original retainer agreement. Further, after paying two of the medical care providers promptly, Pels delayed payments to the two additional providers until he was satisfied that their charges were not duplicative or excessive. Additionally, Pels sent his client a letter before any dispute arose, in which he informed her that there were "outstanding costs on your account" and that "those past non-waived costs will be adjusted into your account upon completing the adjusted medical charges." We found that this letter notified the client of Pels' intention to use any amount saved through his negotiations with the medical provider to offset his considerable unwaived past expenses. It also informed the

---

[2]*See, e.g.*, **Haimes v. Miss. Bar**, 601 So. 2d 851 (Miss. 1992) (attorney disbarred for using guardianship funds to pay for personal expenses and failure to learn anything from previous suspension); **Reid v. Miss. State Bar**, 586 So. 2d 786 (Miss. 1991) (attorney disbarred for depositing client funds into his trust account and using the money for personal expenses); **Miss. State Bar v. Odom**, 566 So. 2d 712 (Miss. 1990) (attorney suspended for three years where he deposited a check he received from the sale of an estate into his non-trust account, which he used to pay personal expenses); **Foote v. Miss. State Bar Ass'n**, 517 So. 2d 561 (Miss. 1987) (attorney disbarred for failing to pay off a mortgage for his client with money given to him for that sole purpose); **Miss. State Bar Ass'n v. Strickland**, 492 So. 2d 567 (Miss. 1986) (attorney suspended for three years, where after collection of judgment, kept all the money, deposited it in his personal account and used it for personal expenditures.

17

client that there would be "small additional costs associated with the finalization of your account." *Id*.

¶39. In the present case, there is no evidence of timely communication or conscientiousness, be it made in good faith, or out of confusion. Instead, we deal with the sheer fact that Coleman put over $14,000 into his *personal* checking account, from which 72 checks were drawn and paid before the money was returned to the Fund Administrator. We do not find Coleman's case, therefore, strictly in line with our *Pels* decision. Nor are we persuaded, as counsel for Coleman urged during oral argument in this case, that Coleman made a simple "mistake."

¶40. While we do not find that Coleman should be disbarred, neither do we find that Coleman's conduct warrants but a thirty-day suspension. The Tribunal is affirmed as to Rule 1.15, but reversed as to Rules 8.4 (a, c, and d). We find Coleman violated these Rules. We therefore order that Coleman be suspended from the practice of law for three years.

¶41. **JOE PRICE COLEMAN IS HEREBY SUSPENDED FROM PRACTICING LAW IN THE STATE OF MISSISSIPPI FOR THREE YEARS.**

**PITTMAN, C.J., DIAZ, EASLEY AND CARLSON, JJ., CONCUR. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. COBB, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, P.J. WALLER, J., NOT PARTICIPATING.**

**COBB, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶42. I concur in the majority's rejection of Coleman's procedural and double jeopardy arguments and its conclusion that Coleman's conduct at issue here violated Rule 1.15 and 8.4

(a, c, and d) of the Mississippi Rules of Professional Conduct. However, I respectfully disagree with the majority that a three-year suspension is an adequate punishment for the conduct at issue.

¶43. The Bar has stated to this Court that Coleman's conduct "warrants either disbarment or the imposition of a three (3) year suspension, if this Court deems leniency should be shown." The majority apparently so deems. I must disagree with that decision. There is no persuasive ground for leniency here. If this Court is to take its own pronouncements seriously, then the penalty of disbarment is the more appropriate sanction.

¶44. As the majority's citation to previous commingling cases reveals, we have been less than consistent in the penalties imposed. But past penalties are, at most, one of several factors to be considered:

> This Court has considered five (5) factors in determining the severity of the sanction when an attorney is subject to discipline:
>
> > (A) Nature of the misconduct involved;
> > (B) Need to deter similar misconduct;
> > (C) Preservation of dignity and reputation of the legal profession;
> > (D) Protection of the public; and
> > (E) Sanctions imposed in similar cases.

*Stegall v. Miss. Bar*, 618 So. 2d 1291, 1294 (Miss. 1993) (quoting *Culpepper v. Miss. State Bar*, 588 So. 2d 413, 420 (Miss. 1991)). It is entirely proper for this Court to compare previous cases in deciding what sanctions to impose, so long as we remain cautious that our past leniency does not result in a gradual diminution of the high ethical standards which it is our duty to uphold.

¶45. The majority contends that Coleman's eventual restitution of the misappropriated funds to the client is a mitigating factor, citing our case law for this proposition. *See Miss. Bar v. Gardner*, 730 So. 2d 546, 547 (Miss. 1998). But *Gardner* is an aberration in our jurisprudence on this question. "[R]estitution by an attorney of funds previously misappropriated *does not mitigate the offense*, particularly where the restitution has been made under pressure." *Cotton v. Miss. Bar*, 809 So. 2d 582, 587 (Miss. 2000) (emphasis added) (quoting *Clark v. Miss. State Bar Ass'n*, 471 So. 2d 352, 357 (Miss. 1985)); *accord*, *Foote v. Miss. State Bar Ass'n*, 517 So. 2d 561, 565 (Miss. 1987). Our opinion in *Gardner* failed to note *Clark* or *Foote*, or to support its reasoning on that point with any authority. I believe that these contrary authorities carry more weight than our momentary deviation. Why should the restitution to the client of what the attorney wrongly took be considered mitigation? Jail, not only disbarment, would otherwise confront the attorney. Therefore, restitution is uncertain evidence at best with regards to repentance and contrition.

¶46. Nor do I consider that Coleman's reputation or service should mitigate his offense. The majority notes that he "served on the Bar committee that facilitated the transfer from the Code of Professional Responsibility to the Rules of Professional Conduct." This makes his wrongdoing more egregious, not less. Surely if anyone should have known beyond doubt that what he was doing was absolutely unacceptable, it was Coleman. And yet, this knowledge did not deter him. Apparently he considered himself above the very rules which he had helped to adopt.

¶47. The most important consideration in disciplinary proceedings is "to vindicate the reputation of the bar in the eyes of the public, not to punish an attorney's misdeeds." *Haimes v. Miss. Bar*, 601 So. 2d 851, 854 (Miss. 1992). I believe that the reputation of this Court is also implicated here. Do we actually mean what we have said about misappropriation and commingling of funds?

¶48. In *Reid v. Miss. State Bar*, 586 So. 2d 786 (Miss. 1991), the attorney commingled and converted client funds and was therefore disbarred. This Court wrote that

> There can be no legal *profession* in the absence of scrupulous honesty by attorneys with other people's money. Public confidence here is vital. There may be worse sins, but **the ultimate wrong** of a lawyer to his profession is to divert clients' and third parties' funds entrusted to him to an unauthorized use. A lawyer guilty of such conduct exhibits a character trait totally at odds with the purposes, ideals and objectives of our profession.

*Id.* at 788 (emphasis added). How can we say that commingling is "the ultimate wrong" without imposing the ultimate professional penalty? Does a three-year suspension suggest that such conduct is "totally at odds" with our profession, or just somewhat at odds with it?

¶49. "The mishandling of a client's money by an attorney has often been referred to as the 'cardinal sin' for lawyers." *Cotton*, 809 So. 2d at 586 (attorney disbarred for failing to pay client's bills out of funds held for that purpose). *See Haimes*, 601 So. 2d at 854 (attorney who had "now twice committed the cardinal sin—mishandling a client's money" was disbarment). Should not the cardinal sin reap the cardinal penalty?

¶50. In *Miss. State Bar Ass'n v. Moyo*, 525 So. 2d 1289 (Miss. 1988), the attorney's many offenses included commingling and conversion. Upholding disbarment, this Court wrote:

> When a lawyer puts a client's money into his personal account, he can always say that any check he wrote for his personal benefit came from *his* money in the account, not the client's, and there is no way to actually prove otherwise. Because of this, it is an unethical practice of the most serious order for a lawyer even to mix his client's funds in with his own or, conversely, to use a trust account for personal as well as his clients' transactions.

*Id.* at 1297. Surely, an offense "of the most serious order" merits the most serious penalty.

¶51. In an earlier case wherein we did not match our rhetoric with our reality, *Mississippi State Bar v. Odom*, 566 So. 2d 712 (Miss. 1990), the attorney had commingled and converted estate funds. This Court stated: "The moment a lawyer succumbs to a temptation to appropriate for his own use any of his client's money entrusted to his safekeeping is the moment he shows his unfitness to be a practicing lawyer." *Id.* at 716. No mitigating factors were cited. Nevertheless, only three years' suspension was imposed, just as the majority does today. Three justices dissented, calling for disbarment (they "would disbar Mr. Odom, not merely suspend his license to steal," *id.* at 718 (Sullivan, J., dissenting)). We were shortly thereafter obliged to disbar Odom upon his conviction in circuit court. *Miss. State Bar v. Odom*, 573 So. 2d 710 (Miss. 1990).

¶52. With every year, our profession seems to become less like a true profession and more like just another business enterprise. Bearing in mind our reputation in the eyes of the public, it is imperative that we draw a bold line between our practices and those of the fallen corporate leaders who have recently graced the pages of our newspapers. Given the lack of any acceptable justification for Coleman's offense, and our use of the strongest language to condemn the offense that he committed, any penalty less than disbarment arguably casts doubt on the commitment of the legal profession and of this Court to uphold the highest

ethical standards. We have the Bar's recommendation of disbarment before us. How will the Bar succeed in raising the ethical standards of our state's legal professionals if we succumb to a leniency that is unsupported by the facts of the case? It is important that we support the Bar's effort to take a firm stand.

¶53. I would disbar Coleman and let him pursue the arduous path to reinstatement if his calling to our profession is sincere. I therefore respectfully concur in part and dissent in part.

**SMITH, P.J., JOINS THIS OPINION.**