566 So.2d 712 (1990)
MISSISSIPPI STATE BAR
v.
Joe R. ODOM.
No. 89-BA-121.
Supreme Court of Mississippi.
August 22, 1990.
Michael B. Martz, Jackson, for appellant.
W. Scott Welch, III, Butler Snow O'Mara Stevens & Cannada, Jackson, for appellee.
En Banc.
ANDERSON, Justice, for the Court:
This is an appeal from a Complaint Tribunal which, after receiving evidence of attorney disciplinary violations by Joe R. Odom, recommended that this Court suspend him from the practice of law for a period of three months and publicly reprimand him for violations of the Code of Professional Responsibility. The Tribunal further found that the Bar did not meet its burden of proving fraud, deceit, or dishonesty. The Mississippi State Bar appealed the finding and penalty imposed by the Tribunal. Odom cross-appealed, claiming his suspension too excessive for a sole *713 practitioner. We reverse the order of the Complaint Tribunal and order Odom suspended from the practice of law for three (3) years effective on the date of this decision. Further, we find no merit to Odom's plea on cross-appeal; therefore, it will not be discussed here.

FACTS
Mary Roberts and Mildred Brown of Birmingham were co-executrices and the sole devisees of the estate of Beatrice Schmitz Sheppard, the primary asset of which was the residence of the decedent in Meridian. Odom, a practicing attorney for at least twenty (20) years, was the attorney for the executrices.[1] In order to dispose of the estate's assets, Odom filed a petition to approve the sale of Sheppard's home on March 30, 1986. On April 4, 1986, the chancery court approved the sale of the property for the sum of $45,239.53. The decree authorized the executrices to pay a realtor's commission of $2,700, "all necessary expenses incident to the sale," and directed that they deposit the remainder of the proceeds "in the estate account for future distribution". Roberts and Brown, as stipulated in Sheppard's will, were each to receive proceeds from the sale amounting to $14,117.00.
On April 7, 1986, Odom received a check for $45,239.53 from the sale of the Sheppard's home. Odom had a trust account at a local bank for monies he received as fees and client funds.[2] However, Odom never used the account to deposit the proceeds from the sale, and neither opened nor instructed Brown and Roberts to open a bank account for the Sheppard estate. Rather, the net proceeds from the sale were deposited into an account at the same bank styled "Adams and Odom", which was used for several purposes such as attorneys' funds, fees, accrued interest, review fees, and office and personal expenses. It clearly was not an attorney trust account.
From April 1986 through June 1986, a running balance of the "Adams & Odom" account was as follows: April 7  $284,744.77 (which included the proceeds from the sale of Sheppard's house); April 8  $279,268.77 (which still included the proceeds from the sale of the house); April 16  $1,498.93; ending balance in May  negative $6,889.00; and June 27  negative $55.03 (when Odom wrote Brown and Roberts their checks).
Checks were drawn on the account in question for $9,705.53, to retire mortgages, to make payments for minor repairs, and to pay the title insurance company and realtor; and also, Odom wrote a check to himself for $457.50 for attorney's fees associated with the closing and notary fees of $7.50, leaving $35,534.00 net proceeds.
This sum did not remain on deposit in the account. Odom paid his own personal and business expenses, which bore no relation to the estate expenses. Checks from this account went to pay, among others, telephone bills, life and accident insurance, gasoline expenses, and a deposit on a personal trip to Mexico. On April 16 the account balance was only $1,498.93.
No steps were taken by Odom to close the estate, and in response to a June 4 letter from Brown, a meeting was scheduled for June 27. At this meeting Odom gave the executrices an "accounting sheet" which showed the net assets of $35,534.00, additional deductions for repairs of $195.85, a claim of the local hospital of $2,500.00, notice to creditors of $104.55, leaving a balance of $32,455.00. From this Odom deducted another $4,500.00 for "attorney's fees", leaving a balance of $28,234.00.
On June 27 Odom wrote a check to each of the executrices for $14,117.00. On that date the account had no funds on deposit, and was overdrawn $55.03. Odom asked *714 Roberts and Brown to hold their checks for approximately two weeks. Brown disregarded Odom's request and attempted to cash her check. However, it was not honored by the bank due to insufficient funds.
Roberts retained another attorney, William Neville, Jr., to represent Brown and her. Neville learned from the bank that the funds in the "Adams and Odom" bank account were not sufficient to cover either Brown's or Roberts' check. After learning of Neville's involvement, Odom telephoned him and promised to make good on the checks to the executrices.
Subsequently, Neville filed a motion in Chancery Court for a financial accounting and discharge of the attorney of record [Odom]. A hearing was held on August 18, 1986. Roberts received a cashier's check for $19,221.55, which included $2,500.00 held by Odom in the Sheppard estate for a hospital bill already paid by the insurance company, certain withheld monies for attorney's fees for Odom (Odom reduced his fees from $4,500.00 to $2,000.00), and $14,117.55 owed from the sale proceeds.
Odom explained his position by stating that from 1985 through 1987 the general nature of his law practice consisted of approximately ninety-nine percent of work in claims. Less than two percent of his work involved real estate matters for the same time period. Odom testified that he was not consciously aware of writing checks against funds of any client or deliberately taking money from a client. Thus, none of his clients had ever lost any money as a result of the manner in which he handled his bank account.

I.
The Bar raises the following issues on appeal:
I. THE COMPLAINT TRIBUNAL ERRED BY FINDING THAT ODOM DID NOT VIOLATE THE PROVISIONS OF DR 1-102(A)(4) AND DR 1-102(A)(5) OF THE CODE OF PROFESSIONAL RESPONSIBILITY AND SECTION 73-3-35 OF THE MISSISSIPPI CODE OF 1972, AS AMENDED, WHEN HE CONVERTED AND MISAPPROPRIATED FUNDS BELONGING TO THE BEATRICE SCHMITZ SHEPPARD ESTATE IN 1986.
II. THE COMPLAINT TRIBUNAL ERRED BY FAILING TO IMPOSE DISCIPLINE AGAINST ODOM FOR HIS VIOLATION OF DR 1-102(A)(4) AND DR 1-102(A)(5) OF THE CODE OF PROFESSIONAL RESPONSIBILITY AND SECTION 73-3-35 OF THE MISSISSIPPI CODE OF 1972, AS AMENDED, FOR HIS UNETHICAL AND UNPROFESSIONAL CONDUCT AS DESCRIBED IN THE PRECEDING PARAGRAPH.
The Bar contends that Odom, as a trustee and fiduciary, misappropriated the Sheppard estate funds and used them for his own use and benefit. The Bar submits that such acts by Odom warranted his disbarment from the practice of law.

II.
This Court is charged by law to inquire whether the evidence in a Complaint Tribunal is clear and convincing. "In an attorney disciplinary proceeding, the Supreme Court is the supreme trier of fact, and as a matter of law, is not bound by any findings of fact made by the Complaint Tribunal." Goeldner v. Mississippi State Bar Ass'n, 525 So.2d 403, 406 (Miss. 1988). See also, Rule 9.4, Rules of Discipline. However, while no substantial evidence or manifest error rule shields the Tribunal from scrutiny, we are not prohibited from giving deference to such findings. Id.; Foote v. Mississippi State Bar Association, 517 So.2d 561, 564 (Miss. 1987).
Mississippi Code Annotated § 73-3-35, (Supp. 1988), gives the lawyer's oath:
Every attorney and counselor at law, before he shall be permitted to practice, shall produce his license in each court where he intends to practice, and in the presence of such court, shall take the following oath or affirmation to wit:
`I do solemnly swear (or affirm) that I will demean myself, as an attorney and counselor of this court, according to the best of my learning and ability, and with all good fidelity as well to the court as to *715 the client; that I will use no falsehood nor delay any person's cause for lucre or malice, and that I will support the constitution of the State of Mississippi so long as I continue a citizen thereof. So help me God.'
And thereupon the name of such person, with the date of his admission, shall be entered in a roll or book to be kept in each court for that purpose.
DR 1-102(A)(4), (5) of the Code of Professional Responsibility provides "a lawyer shall not violate a disciplinary rule, engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; or engage in other conduct that reflects adversely on his fitness to practice law."
With these rules in place, we are not hesitant in imposing substantial sanctions when an attorney's act evinces want of personal honesty and integrity or renders such attorney unworthy of public confidence. Foote, 517 So.2d at 564. Generally, disbarment is appropriate when "a lawyer knowingly converts client property and causes injury or potential injury to a client." Id. (citing American Bar Association Standards For Imposing Lawyer Sanctions (1986) 4.11) (emphasis added).
Similarly, acts of dishonesty, fraud, deceit, and/or misrepresentation constitute grounds for disbarment. See, Clark v. Mississippi State Bar Ass'n, 471 So.2d 352 (Miss. 1985) (tribunal's disbarment of attorney for misappropriation of conservatorship funds affirmed by Court); Brumfield v. Mississippi State Bar Association, 497 So.2d 800 (Miss. 1986) (tribunal's ninety-day suspension vacated and Court imposed disbarment where attorney defrauded family members while acting in a representative and fiduciary capacity); Foote, supra (tribunal's disbarment affirmed of attorney who converted funds obtained from purchaser at real estate closing); Mississippi State Bar Association v. Moyo, 525 So.2d 1289 (Miss. 1988) (tribunal's order of a public reprimand vacated and disbarment imposed where attorney solicited case and converted minor client's money).
However, in Goeldner, supra, even though a lawyer's conduct constituted a fraudulent misrepresentation, the Court found disbarment too severe and vacated the order of the Tribunal and suspended the attorney. 525 So.2d at 407. See, also, Hoffman v. Mississippi State Bar Association, 508 So.2d 1120 (Miss. 1987) (tribunal's order of disbarment vacated and one-year suspension imposed where attorney knowingly participated in double-billing of client and fraudulent procurement of funds); Pitts v. Mississippi State Bar Association, 462 So.2d 340 (Miss. 1985) (180-day suspension issued to Pitts for failing to establish savings account for client unduly harsh and instead ordered a 30-day suspension and public reprimand).
This Court must determine, therefore, whether an attorney's misconduct is of such magnitude that it warrants disbarment from the practice of law. Foote, 517 So.2d at 564. In the past where an attorney's misconduct was found to be deliberate or intentional, we have upheld findings of violations of DR 1-102. Steighner v. Miss. State Bar, 548 So.2d 1294 (Miss. 1989) (citing Goeldner, 525 So.2d at 406); Moyo, supra; Foote, supra. Keep in mind that restitution by an attorney of misappropriated funds does not mitigate the offense. Clark, 471 So.2d at 357.
In Pitts, supra, attorney Pitts undeniably deceived both his client and the chancery court by failing to establish a savings account with client's funds and to account for those funds, and misrepresenting to the client and chancellor as to the whereabouts of those funds. In vacating the Tribunal's 180-day suspension and ordering a 30-day suspension and public reprimand, the Court based its order upon the record and the recognized three-fold purposes of punishment. There, the Court stated:
First, there is the obvious intent to punish the wrongdoer to the degree that the sanction is appropriate for the offense. Secondly, many theories on the role of sanctions recognize their utility as a deterrence to further violations both on the part of the immediate offender and the general community. Finally, sanctions have a definite role in reinforcing the *716 confidence of the general public in the ability of society to govern itself. This third role is particularly important in regard to Bar disciplinary proceedings because our profession assumes the responsibility of governing its members. Therefore, public confidence and faith in the integrity of the entire Bar is dependent upon our willingness to impose appropriate sanctions on our members who have violated the Code of Professional Responsibility.
462 So.2d at 343.

III.
Odom violated the Code of Professional Responsibility. From the facts given above it can be seen that Odom was guilty of the following acts and omissions, all of which reflected upon his fitness to be a practicing attorney in this state:
1. He did not set up an estate account as directed by the Lauderdale County chancery court.
2. He did not deposit the funds in a trust account where the clients' funds could always be clearly identified and paid.
3. He deposited the $45,239.53 in what to all intents and purposes was a combination personal and office expense account, thereby hopelessly commingling his clients' funds with his own, as well as other clients whose money was entrusted to him.
4. He promptly used the estate's money to pay his own debts and expenses. He clearly converted his clients' money to his own use.
5. For well over a month he took no steps to close the estate, and it was only after a June 4, 1986, letter from Brown that he set up a meeting three weeks later on June 27. Without this prodding the length of time he would have kept and used his clients' money is a matter of conjecture.
6. He gouged his clients by a $4,500.00 fee (which he set and paid himself), and then wrote them checks when there were insufficient funds on deposit to honor them.
7. He asked his clients to "hold" the checks under the pretext of needing to get chancery court approval for disbursement, knowing full well, of course, that he did not have enough money on deposit to honor them.
8. It was necessary that the executrices employ another lawyer to get the estate's affairs straightened out, and lawfully, what was their money.
Odom committed several wrongful acts. The commingling of his clients' funds was the most egregious. The moment a lawyer succumbs to a temptation to appropriate for his own use any of his client's money entrusted to his safekeeping is the moment he shows his unfitness to be a practicing lawyer. Such a character flaw should not be tolerated. Acts such as Odom's cannot be tolerated by members of our profession. Therefore, we Order that Odom be suspended from the practice of law for three (3) years.

IV.
We also must address the fact that in its Opinion and Judgment, the Tribunal stated that it "elected to exercise mercy and make no finding with regard to whether or not [Odom] misappropriated any of the Sheppard estate funds." This election not to make such a finding was inappropriate. In this cause, the evidence was sufficient to make a finding and the Tribunal should have done so and entered it in its Opinion and Judgment. Thus, we caution Tribunals in the future to make such findings where there lies sufficient evidence.

CONCLUSION
Here, the record evinces enough evidence that Odom commingled his clients' funds with his own. The sentence imposed by the Complaint Tribunal for such misconduct was too lenient. However, in recognizing the outlined purposes of punishment, we do not find disbarment an appropriate penalty. Therefore, we reverse the Tribunal's penalty and Order Odom's suspension from the practice of law for three *717 (3) years. We find no need to discuss Odom's cross appeal in light of our ruling.
REVERSED AND RENDERED.
ROBERTSON, PITTMAN and BLASS, JJ., concur.
DAN M. LEE, P.J., concurs in result only.
HAWKINS, P.J., and PRATHER and SULLIVAN, JJ., dissent.
ROY NOBLE LEE, C.J., not participating.
SULLIVAN, Justice, dissenting:
Taking the facts as found by the majority as the record of this case, with great respect I must dissent.
What did Mr. Odom do? He received a court order to deposit the remainder of the proceeds from the house sale in the estate account for future distribution. There was no estate account. He had a trust account but he did not deposit the funds in the trust account either. Instead, he commingled the money belonging to Roberts and Brown into an account styled "Adams & Odom."[1]
Mr. Odom then took no further steps to close the estate until one of his clients wrote to him. Mr. Odom then scheduled a meeting for the 27th day of June where he charged his clients $4,500.00 as attorneys fees and presented them with an accounting sheet that led them to believe that the estate had on hand $28,234.00, after the attorneys fees were deducted. As a matter of fact on June 27, the balance in the "Adams & Odom" account was minus $55.03.
He then gave a check for $14,117.00 to Brown and a like check to Roberts and asked them to hold those checks for approximately two weeks. At the time he did this there were insufficient funds to cover the checks.
Roberts then went to the expense of hiring another attorney to represent Brown and her to find out what her first attorney was doing. Caught, Mr. Odom telephoned the new attorney and promised to make good on the checks to the executrices. Not only did Mr. Odom make good but he graciously consented to reduce his fee from $4,500.00 to $2,000.00.
Mr. Odom explains to us that since so little of his work involved real estate matters apparently a trust account, although required, was not necessary in his opinion and that he was not consciously aware of writing checks against funds of any client or deliberately taking any money from a client. The best I can make of this argument is it seems to be that ignorance of the law is an excuse if you are a lawyer.
DR 1-102(A)(4), (5) of the Code of Professional Responsibility does provide that "... a lawyer shall not violate a disciplinary rule, engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; or engage in other conduct that reflects adversely on his fitness to practice law."
In my opinion, the conduct of Mr. Odom in this case (1) violates disciplinary rules, (2) was conduct involving at best deceit and misrepresentation, and (3) was conduct that reflects adversely on his fitness to practice law.
In my opinion, Mr. Odom also violated Mississippi Code Annotated, § 73-3-35 (Supp. 1988), in that his conduct is certainly not "... with all good fidelity as well to the court as to the client;" and furthermore, Mr. Odom did use falsehood and delayed his clients' cause.
I am also of the opinion that Mr. Odom violated Mississippi Code Annotated, § 97-11-25, when, as an attorney at law undertaking to act for clients and entrusted by them with business and with money, he unlawfully converted that money to his own use and he did not turn the money over immediately when called upon to do so. Violation of this statute if convicted, carries with it a sentence of imprisonment in the penitentiary for not more than twenty years or a fine of not more than $5,000.00.
In Chapter 19 under the heading False Pretenses and Cheats, one finds Section 97-19-67, which deals with bad checks. A conviction under this statute can be punished by a fine of not less than $100.00 nor *718 more than $1,000.00 or by imprisonment in the state penitentiary for a term of not more than three years or both in the discretion of the court.
It is of little benefit for Mr. Odom to argue, as he does, that none of his clients have ever lost any money as a result of the manner in which he handled his bank account. That he ultimately made restitution does nothing to mitigate his offense. State, ex rel., Oklahoma Bar Association v. Raskin, 642 P.2d 262 (Okla. 1982); In re Wilson, 81 N.J. 451, 409 A.2d 1153 (1979); ABA Standards For Imposing Lawyer Sanctions, Standard 9.4(a). Mr. Odom violated trust. He knew the rules, his clients did not. He misled his clients and the court and he is culpable. Can we blame Roberts and Brown if they hold Mississippi lawyers in low regard? What client or chancellor should be required to depend again upon the solemn word of Mr. Odom?
Mr. Odom disobeyed a chancery court order which could have led to his incarceration for contempt. Mr. Odom violated a statute which could have led to his incarceration for embezzlement. What is Mr. Odom's response to the bar's accusations of impropriety in his conduct? He complains that his suspension of three months and public reprimand is too excessive. I find that I agree with Mr. Odom and with the majority in their disdain for the ruling of the Complaint Tribunal. I view that ruling as a mere kiss upon the wrist handed out to a member of the bar who embezzled money and only paid it back when he was caught by another member of the bar. I am without sympathy for Mr. Odom. I do, however, admire his gall.
By his conduct Mr. Odom has convinced me that he is not fit to practice our profession or any other that involves honesty, integrity and trust.
I would disbar Mr. Odom, not merely suspend his license to steal.
HAWKINS, P.J., and PRATHER, J., join this dissent.
NOTES
[1] Odom, a Lauderdale County attorney and member of the Bar since 1962, had performed legal services for Sheppard prior to her death. In her will she requested that Odom be used to probate her estate.
[2] This trust account, opened in 1962 by Odom, was still at Deposit Guaranty on April 7th. However Odom had not maintained it since 1968 when he stopped practicing solo and went into practice with a partner. At that time, his partner and he opened the "Adams & Odom" account.
[1] What we call "commingling" when done by a lawyer, we call stealing when done by a layman.