DICKINSON, Justice,
for the Court.
¶ 1. On March 27, 2002, the Mississippi Bar filed a formal complaint against attorney William E. Catledge, alleging that he violated Mississippi Rules of Professional Conduct 1.3 (diligence), 1.4 (communication), 1.15 (safekeeping property), and 8.4(a), (c) and (d) (misconduct).. These alleged violations arose from Catledge’s representation in the wrongful death litigation of Mary Shields, the mother of a two-year-old child killed in a house fire. The litigation was settled, and Shields’s portion of the settlement ($7,871.43) was sent to Cat-ledge on October 11, 2000. Catledge obtained Shields’s endorsement of the settlement check at a correctional facility where she was an inmate on October 12 and, four days later, deposited the check ■ into- his payroll account. Catledge did not use his trust account because of problems he attributed to bank error.
■ ¶ 2. Catledge paid $500.00 to Shields’s correctional facility account on October 23, 2000, leaving a balance due to Shields of $7,371.43. Between October 18 and November 3, Catledge and his bookkeeper wrote checks on the payroll account for firm expenses,[1] causing the balance of Cat-ledge’s payroll account to fall below $7,371.43 on several occasions. Catledge says, however, there were undeposited checks totaling $18,436.36 in his office on October 18-19, 2000, and he was unaware that, without those deposits, the payroll account balance would fall below $7,371.43. Catledge deposited the $18,436.36 on October 20, and an additional $11,600.00 on Monday, October 23, 2000. Catledge argues that, because the undeposited funds were in his office, Shields’s money was never at risk.
¶ 3. When Catledge realized he paid the bank' with a check from the payroll account, he wrote a second check from his client trust account for $4,000 on October 30, 2000 to pay the bank. He requested that the second check be used to pay the nóte in place of the check delivered to the bank th'é previous Friday. However, the bank paid both checks, which resulted in a $4,000.00 reduction in both the payroll and trust accounts. This resulted in an overdraft of the client trust account by $3,974.35.
¶ 4- The remaining $7,371.43 due to Shields was paid as follows: $2,500 check *182 to Mary Hadden on November 16, 2000; $500 in postal money order to Shields at MDOC on March 12, 2001; and $4,371.43 cheek to Shields at MDOC on March 27, 2001.
¶ 5. After Shields filed a complaint against him concerning his mishandling of client funds, Catledge hired Wayne Miles a certified public accountant on about March 28, 2001. Myles reorganized Catledge’s system for handling the client trust account.
¶ 6. The charges against Catledge were investigated by a Complaint Tribunal which concluded that Catledge should be suspended from the practice of law for one year. Both Catledge and the Mississippi Bar filed appeals to this Court. Catledge says his only sanction should be a public reprimand while the Mississippi Bar advocates disbarment. The following issues are raised on appeal to this Court:
I. Whether Catledge received proper sanctions from the Tribunal.
II. Whether the Tribunal erred as a matter of law by making findings of fact which required a conclusion of law that Catledge had violated the provisions of M.R.P.C. 8.4(a) and (c), but failed to include such a conclusion of law in its Opinion and Judgment.
III. Whether the Complaint Tribunal abused its discretion by allowing Catledge to present testimony and proof at the February 14, 2003 hearing.
DISCUSSION
¶ 7. “The Supreme Court of Mississippi has exclusive and inherent jurisdiction in bar disciplinary matters.” Miss. Bar v. Pels, 708 So.2d 1372, 1373 (Miss.1998). See also R. Discipline Miss. State Bar 1(a). In matters involving attorney discipline, this Court conducts a de novo review. Miss. Bar v. Shelton, 855 So.2d 444, 445 (Miss.2003) (citing Pels, 708 So.2d at 1373). See also R. Discipline Miss. State Bar 9.4. This Court must decide each disciplinary case on its own unique merits. Fougerousse v. Miss. State Bar Ass’n, 563 So.2d 1363, 1366 (Miss.1990). “On appeal, this Court, ‘shall review the entire record and the findings and conclusions of the Tribunal, and shall render such orders as the Court may find appropriate.’ ” Miss. Bar v. Sweeney, 849 So.2d 884, 887 (Miss.2003) (quoting Foote v. Miss. State Bar Ass’n, 517 So.2d 561, 564 (Miss.1987)). This Court may give deference to the findings of the Tribunal. Id. “This Court is free to evaluate the discipline imposed on an attorney and on review modify punishment as needed to best serve the interest of the Bar and the public.” Parrish v. Miss. Bar, 691 So.2d 904, 907 (Miss.1996). “The burden is usually on the Mississippi Bar to show by clear and convincing evidence that an attorney’s actions constitute professional misconduct.” Shelton, 855 So.2d at 445 (quoting Pels, 708 So.2d at 1373).
I. Whether Catledge received proper sanctions from the Tribunal.
¶ 8. Catledge argues his sanction should be no greater than a public reprimand. He directs us to the following excerpt from the Tribunal’s findings:
In the case of Mr. Catledge, there is no evidence that Mr. Catledge intentionally utilized the funds of Mary Shields. Mr. Catledge was not well verséd in proper accounting procedures and bookkeeping and failed to implement the necessary controls to protect the viability of his accounts, which he acknowledged and took full responsibility for. Unlike many of the other cases involving this type of conduct, Mr. Catledge made no misrepresentations to his client or the Court and from all appearances forth *183 rightly cooperated with the Bar in its investigation of this matter. There simply is no evidence to this Tribunal that Mr. Catledge intended to utilize Mary Shields’ funds, but, rather, this was an offense of inadvertence.
¶9. Catledge admits that he allowed Shields’s money to become commingled with his firm’s money for a period of about two weeks, but he claims that his bank’s mistakes caused the problem. He says he had no intention of converting client funds, and he points out that, because of the undeposited funds in his office, he had no need to convert client funds to his own use. He further informs us that he has addressed the problem by hiring a C.P.A. to implement controls for safeguarding client funds.
¶ 10. The Bar says Catledge should be disbarred because he intentionally commingled client funds. The Bar points out that Catledge’s testimony is the only evidence that the bank made errors. Furthermore, the Bar disputes that Catledge could have paid Shields the money due her, had she requested it on October 18-19, 2000. Finally, the Bar, argues that Catledge’s commingling of client funds, his use of client money for personal purposes, and his past disciplinary record, when considered together, require disbarment.
¶ 11. When considering the imposition of sanctions, this Court has stated:
The primary concern when imposing sanctions for attorney misconduct is that the punishment be sufficient “to vindicate in the eyes of the public the overall reputation of the Bar.” The Court uses two sets of criteria when reviéwing the sanctions for misconduct. Miss. Bar v. Alexander, 669 So.2d 40, 42 (Miss.1996). However, the Court is essentially “free to evaluate the discipline imposed.on an attorney and on review modify punishment as needed to best serve the interest of the Bar and public.”
Parrish, 691 So.2d at 907 (citing Miss. State Bar v. Blackmon, 600 So.2d 166, 173 (Miss.1992)).
¶ 12. The two sets of criteria mentioned in Parrish include nine areas of inquiry, four of which originate from the American Bar Association standards. These areas of inquiry include:
(1) the nature of the conduct involved;
(2) the need to deter similar misconduct;
(3) the preservation of the dignity and reputation of the profession;
(4) the protection of the public; .and
(5) the sanctions imposed in similar cases.
(6) the duty violated;
(7) the lawyer’s mental state;
(8) the actual or potential injury caused by the lawyer’s misconduct; and
(9) the existence of aggravating or mitigating circumstances.
Miss. Bar v. Sweeney, 849 So.2d 884, 888 (Miss.2003). See also Parrish, 691 So.2d at 907; Miss. Bar v. Alexander, 669 So.2d 40, 42 (Miss.1996); Miss. Bar v. Attorney ST, 621 So.2d 229, 233 (Miss.1993); Blackmon, 600 So.2d at 173.
1. The nature of the conduct in- ' volved.
¶ 13. The Tribunal found that “[i]t is clear from the findings by this Tribunal that Mr. Catledge commingled and utilized the money of Mary Shields.” However, unlike Miss. State Bar v. Odom, 566 So.2d 712, 716 (Miss.1990) and other similar cases, the Tribunal found that he did not use his client’s money from “a temptation to appropriate for his own use.” Catledge attempts to minimize his actions by claiming that the actions were “inadvertent” and at least partly due to bank errors. We find that Catledge’s actions constitute *184 per se violations of M.R.P.C. 1.15 and 8.4(a) and (c), even though the Tribunal found only a violation of Rule 1.15.

2. The need to deter similar misconduct'

[2]

¶ 14. Miss. Bar v. Coleman, 849 So.2d 867, 874 (Miss.2002), states in part that “[c]ommingling of client funds is the ‘cardinal sin’ of the legal profession, whether done intentionally or not.” Catledge argues that his case is distinguishable from Pitts v. Miss. State Bar Ass’n, 462 So.2d 340, 343 (Miss.1985) and Coleman, Coleman is distinguishable, according to Catledge, because the attorney intentionally deposited the client funds into his personal account and the attorney had a negative balance in the account. Coleman, 849 So.2d at 869-70. Therefore, Catledge asserts that Coleman needed the money immediately and was too busy to mail a check to the fund administrator. In Pitts, an attorney failed to deposit insurance proceeds into the bank account of a client’s minor child as instructed per court order for nine years. Pitts, 462 So.2d at 341. The attorney also made misrepresentations to the client and a judge about the funds. Id. at 342. This Court in Pitts reduced the Tribunal’s 180-day suspension to a 30-day suspension and public reprimand. Id. at 343. Catledge distinguishes his actions from these two cases claiming that unlike Coleman, he did not commingle the funds intentionally or in a calculated manner. Instead he commingled the funds inadvertently and because of bank errors for a period of two weeks with the balance being only five days below the requisite amount. Likewise, Catledge maintains that Pitts made misrepresentations to his client and a judge, failed to adhere to a court order and failed to deposit the money for nine years. Moreover, Catledge asserts that the need to deter similar conduct is obviated because prior to the disciplinary action he worked with the bank, had a C.P.A. review his office accounting procedures and set-up an accounting system to avoid any problems in the future, and he is willing to have periodic audits of his accounts.
¶ 15. The Bar argues that Cotton v. Miss Bar, 809 So.2d 582, 587 (Miss.2000) and Miss. Bar v. Sweeney, 849 So.2d 884 (Miss.2003), are applicable to this case in addition to Pitts and Coleman. In Cotton, the attorney retained a portion of the settlement fee for the payment of the client’s medical bills, however, the attorney failed to pay the bills in a timely manner. Only after the medical provider sued the client for non-payment of the bills did the attorney pay the bills and the lawsuit was dismissed. In the interim, the attorney used the money for other purposes. Cotton was disbarred for his actions. The Bar asserts that Catledge’s actions were the same as Cotton’s and therefore, Catledge should be disbarred as well.
¶ 16. In Sweeney, the attorney was found to be guilty of misappropriating client funds. The Tribunal recommended suspending Sweeney for one year, but this Court impose a three-year suspension. Sweeney represented one of three heirs and either she or the client allegedly received proceeds from the sale of various items, and Sweeney had a check in the amount of $6,600.65 for the sale of estate property. The $6,600.65 was deposited into Sweeney’s trust account, instead of an estate account oyer the course of nine months. The Bar maintains that like Sweeney, Catledge should not be rewarded for *185 paying Shields money that she was already entitled to have from the settlement. The Bar requests that this Court disbar Cat-ledge to deter similar conduct, preserve the dignity and reputation of the legal profession and protect the public.

3. The preservation of the dignity and reputation of the profession.

¶ 17. The Tribunal indicated that within Catledge’s own community the opinion of the Bar would decrease if suspension was imposed upon Catledge. However, the Tribunal disregarded that opinion and determined that the more appropriate criteria was the “overall reputation of the Bar” not just Catledge’s community.
¶ 18. Catledge presented testimony from retired Chief Justice Armis Hawkins, Tim Balducci, Reverend Eugene Brandon and Kenneth Mayfield, all of which indicated that the reputation of the Bar would suffer if Catledge were suspended from the practice of law. The Bar presented no evidence on this point.
¶ 19. The Bar argues that to preserve the dignity and reputation of the Bar, Cat-ledge should be disbarred similar to Haimes v. Miss. Bar, 601 So.2d 851 (Miss.1992) and Reid v. Miss. State Bar, 586 So.2d 786, 788 (Miss.1991).

4. The protection of the public.

¶ 20. While acknowledging that the protection of the public is of utmost importance in Bar disciplinary matters, the Tribunal determined that Catledge satisfied this concern because he has put proper safeguards into effect to avoid any future problems.
¶21. The Bar argues that disbarment is needed to protect the public, but Cat-ledge contends that he satisfied the Tribunal by putting appropriate mechanisms in place to safeguard client funds in the future and expressing willingness for periodic audits and attending trust account management seminars. Within less than two weeks of receiving notice of this situation (March 2001), Catledge contacted the C.P.A. and now has controls in place to avoid any trust account problems.
¶ 22. The Bar presented no witnesses or evidence to contradict Catledge’s assertions. Furthermore, this matter has been ongoing since mid-March 2001, four years from today’s date. Catledge argues that the one-year suspension recommended by the Tribunal would send the wrong message and effective remedial action, as accomplished in his case, would better protect the public.

5.The sanctions imposed in similar cases.

¶ 23. The Tribunal acknowledged that similar disciplinary cases normally impose sanctions of three year suspension or disbarment. However, the Tribunal found that in some cases a lesser penalty is warranted as further discussed in the rest of the findings by the Tribunal.
¶ 24. Catledge argues that the facts of his case are less egregious and distinguishable from other cases imposing sanctions of either three years or disbarment. Of all the cases imposing these sanctions, Cat-ledge alleges that his case is most similar to Miss. Bar v. Pels, 708 So.2d 1372 (Miss.1998). In Pels, the attorney received sanctions from the District of Columbia due to commingling client funds with general and operating funds. The Mississippi Bar processed the action for reciprocal discipline, and this Court imposed a thirty day suspension. Id. at 1376. This Court held:
We recognize the seriousness of commingling personal funds with those of the client. We are considerably persuaded in the present case, however, by the observations of the amici curiae ap *186 pointed by the United States Court of Appeals for the District of Columbia Circuit. They note that the record reveals, no evidence that Pels engaged in any dishonesty, misrepresentation to his client, lying to the disciplinary authorities, or systematic diversion of his client’s funds for personal purposes. Conduct of this egregious nature has been present in virtually all misappropriation cases where this Court has concluded that disbarment was necessary. See, e.g., Clark v. Mississippi State Bar Ass’n, 471 So.2d 352, 354 (Miss.1985) (attorney withdrew and spent funds from conservatorship’s savings account then filed reports reflecting balance in account when no account existed); Gex [v. Mississippi Bar, 656 So.2d 1124, 1125-26 (Miss.1995)] (attorney misrepresented his authority, to cancel deed of trust in return for payoff when in fact he had assigned his interest in the deed to a third party; he then received and used the payoff funds for personal expenses); Raimes v. Mississippi Bar, 601 So.2d 851, 852-53 (Miss.1992) (attorney transferred $5000.00 belonging to guardianship of incompetent to personal account and paid himself unauthorized “fees” for services rendered).
This Court further held that under the totality of the circumstances “the purposes of attorney discipline — preservation of the dignity and reputation of the legal profession and the protection of the public — are properly served by a thirty-day suspension.” See Haimes, 601 So.2d at 854 (“ primary purpose of disciplinary action is to vindicate the reputation of the bar in the eyes of the public”).
¶ 25. Catledge argues that like Pels, the commingling was inadvertent, he did not engage in any dishonesty or make any misrepresentations to his client, he was open and honest with the Bar and Tribunal, he engaged in no systematic diversion of client funds for personal use, and unlike Pels this case involved problems created in part by a bank. The Bar presented no witnesses or evidence to contradict Cat-ledge’s assertion that the problems with his trust account were due to bank error.
¶ 26. Catledge urges this Court to impose sanctions no greater than those in Pels. Catledge cites to cases from other jurisdictions, such as In re Conduct of Mannis, 295 Or. 594, 596, 668 P.2d 1224 (1983), wherein the Oregon Supreme Court sanctioned an attorney with a public reprimand for commingling funds. In Mannis, the Court considered that the attorney’s commingling was done without an intent to enrich himself, the client had no harm, and the attorney implemented a system for banking, accounting and bookkeeping. Id.
¶ 27. Catledge distinguishes his actions from those of other attorneys. In Coleman, Catledge argues that the attorney intentionally wrote a check to himself and deposited it into a personal account from which he and his wife wrote over 72 checks. Catledge claims that his commingling was inadvertent, unintentional, brief and his client was never delayed in the use of her funds.
¶ 28. In Miss. Bar v. Odom, 566 So.2d 712, 713 (Miss.1990), the attorney for co-executrices of an estate placed proceeds from the sale of a house into a multipurpose account. The attorney used some of the money for personal and business expenses, charged additional attorney’s fees, wrote checks to each executrix even though the account was overdrawn, and asked each executrix to wait two weeks before cashing the checks. The clients had to hire a new attorney to sort out the estate. Id. at 713-16. Catledge argues that his actions are not as culpable as those in Odom, because he did not intentionally convert funds for his own use, and *187 the commingling lasted only two months. Furthermore, he points out that he did not overcharge his client, he did not make any misrepresentations nor was another attorney necessary to clear up any problems.
¶29. Likewise, Catledge distinguishes his actions from Miss. Bar v. Sweeney, 849 So.2d 884 (Miss.2003), and Miss. Bar v. Gardner, 730 So.2d 546 (Miss.1999). In Sweeney, an attorney for an administratrix commingled funds from the sale of property, estate assets were sold without prior court approval, nor did he cooperate with the Bar and failed to respond or appear before the Tribunal. In Gardner, the Bar brought disciplinary charges against the attorney after the State of Louisiana imposed sanctions for commingling client funds. In that case, several occurrences of commingling funds in amounts between $10,000 to $30,000 of client and third party funds went unaccounted. The attorney repaid the funds and this Court imposed a one year suspension. Catledge argues that his actions were not as egregious as those of Gardner because there were multiple instances of commingling amounting to tens of thousands of dollars and Gardner made restitution after the charges. In contrast, Catledge claims that the commingling was inadvertent, grew out of a banking error, Shields was never denied or delayed her client funds, and he has procedures to safeguard client funds are in place.
¶ 30. The Bar cites to Cotton, Reid, Haimes and Foote as similar cases that imposed disbarment. In addition, the Bar also cites to Sweeney, Coleman and Odom as similar cases that imposed three (3) year suspensions.

6. The duty violated.

¶ 31. The Tribunal did not set out this factor for discussion. However, in the discussion section the Tribunal stated that M.R.P.C. 1.3, 1.4, 8.4(a), (c) and (d), and 1.15 were at issue. Of these, the Tribunal found that Catledge violated M.R.P.C. 1.15 by clear and convincing evidence.
¶ 32. Catledge admits that he violated M.R.P.C. 1.15 by failing to keep Shields’s money separate from his own. He contends that any argument by the Bar that suggests that his conduct was more than inadvertent commingling fails on the proof. Catledge maintains that he made all deposits between October 12-31, 2000, soon after the money was received. During that period of time, Catledge says he was involved in the settlement of a suit by approximately 100 plaintiffs against a finance company. He was required to travel throughout northeast Mississippi into several courts to obtain signatures and court approval on numerous documents.
¶ 33. When he returned to his office Catledge made a deposit of over $18,000 to the payroll account, the same account where Shields’ money had been deposited. In essence, Catledge contends that there were adequate funds available, and had Shields asked for the money at any time, the money was available.
¶ 34. The Bar contends that a violation of M.R.P.C. 1.15, without more, should require a one-year suspension. The Bar further contends that because Catledge admits to personally making deposits between October 12-21, 2000, he cannot claim that he inadvertently commingled Shields’s money with his payroll account. According to the Bar, the issue centers on whether there were adequate funds in the payroll account at all times to cover the trust obligations.
7. The lawyer’s mental state.
¶ 35. The Tribunal found that “there is no evidence that Mr. Catledge intentionally utilized the funds of Mary Shields.” In *188 addition, the Tribunal also found that, in the past, Catledge failed to implement adequate accounting procedures, and that he took responsibility for this shortcoming. The Tribunal found he made no misrepresentations, and cooperated with the Bar.
¶ 36. Catledge agrees with the Tribunal’s assessment. In addition, Catledge reminds us that as soon as he was notified of the problem he contacted a C.P.A. and implemented accounting procedures to safeguard client funds.
¶ 37. The Bar Contends that Catledge was not suffering from any emotional or mental disability at the time of his actions. Further, the Bar argues that Catledge’s testimony indicates that he does not deserve to keep his license to practice law. The Bar claims that Catledge’s mental state concerning the way to handle client funds is at odds with the Rules of Professional Conduct to such an extent that it requires the revocation of his license.

8. The actual or potential injury caused by the lawyer’s misconduct.

¶ 38. The Tribunal found that Shields suffered no injury because she received all the money owed to her on or before the time that she requested the payments. Catledge agrees with the Tribunal that there was no actual or potential harm to Shields. The Bar concedes that in this case the potential for harm or injury to Shields was minimal.

9. The existence of ayyravating or mitigating circumstances.

¶ 39. The Tribunal noted that the aggravating circumstances in this case related to Catledge’s “prior experiences with the Bar.” As for mitigating circumstances, the Tribunal considered that “Catledge did not intentionally utilize Mary Shields’ money. There were, in fact, funds available to make Mary Shields whole.” In addition, the Tribunal also considered that “Cat-ledge is active in his community, has a good reputation for truth and honesty, but was simply less than attentive in controlling his law office accounting.”
¶ 40. The Bar argues that discipline is handed down on a case-by-case basis, but Catledge has had three informal admonishments, five private reprimands, and four public reprimands. The Bar contends that the prior disciplinary matters should overshadow the mitigating or extenuating circumstances. Further, the Bar characterizes Catledge’s mitigating circumstances as being of “minimal value.” The Bar requests that Catledge be disbarred for his conduct.
¶ 41. Catledge does not deny that his prior disciplinary adjudications have been numerous, but he offers in mitigation several points concerning the prior discipline.

Prior commingling incident

¶ 42. One of the prior actions pertains to an incident in 1999, when Catledge received a public reprimand for depositing a trust check into his general account. The Tribunal’s findings in that case stated, in part, that “[t]he bank advises that there would have been in fact sufficient funds in the trust account to pay the dishonored check, but for certain improper charges by the bank to the trust account.” This was true even though the original settlement check from the insurance company was improperly deposited in the general account instead of the trust account.
¶ 43. Even if true, we fail to see how this fact serves to mitigate the charge in that case. The fact that Catledge could have covered his trust check to one client using funds belonging to another, is hardly mitigating in our view and should not have been offered in mitigation by Catledge, nor accepted in mitigation by the Tribunal in *189 that case. When an attorney commingles trust funds with his own funds, the offense of commingling is complete. However, the Tribunal found Catledge had no intent to take the funds for his personal use. This finding, while not helpful on the commingling offense under M.R.P.C. 1.15 (safekeeping property), would serve to mitigate a violation of M.R.P.C. 8.4 (a), (c) and (d) (misconduct).
¶ 44. Further, Catledge argues that six of the disciplinary matters arose from the same mass-tort action. The issue before the Tribunal there was not commingling of client funds or mishandling of funds. The Tribunal found that Catledge’s contingency fee contract did not contain sufficient detail to satisfy the requirements of M.R.P.C. 1.15.

Appropriate discipline

¶ 45. We conclude that a public reprimand is not a sufficient discipline for Catledge in this case. We cannot ignore the following facts in reaching our decision:
¶ 46. Prior disciplinary problems. Catledge has had twelve prior adjudications of misconduct. Although he does offer legitimate mitigating factors, his disciplinary record is, according to the Bar, the third worst record in the history of the Mississippi Bar. Catledge has already been publicly reprimanded for commingling client funds with his own. The same lenient punishment for the. same offense only a few years later would, in our opinion, lessen the public’s confidence in the Bar’s (and this Court’s) resolve to police the profession.
¶ 47. Careless use of bank accounts. Catledge had three bank accounts: a firm general operating account, a payroll account and a trust account. Catledge offers no explanation why he paid firm bills and a loan payment from his. payroll account (where client money had been deposited) rather than his firm operating account. We note that the Bar offers little help here. No questions were asked and no evidence presented by the Bar concerning the firm operating account. This absence of evidence causes us to refrain from heavily weighing this fact, but we nevertheless must consider it.
¶ 48. Bank error. Catledge offered no evidence to substantiate the bank error which led to his use of the payroll account ás a “temporary trust account. Again, we are unable to weigh this factor too heavily against Catledge, since the Bar offered no witnesses or evidence concerning the issue. It appears the Bar accepted the explanation as true at the hearing, but now calls it into question before this Court. We accept Catledge’s unrebutted explanation as true, but might have given it more weight, if we had a clear explanation from the bank of .the circumstances.
¶ 49. Commingling of funds. We begin with Catledge’s admission that he commingled trust funds with his own when he deposited Mrs. Shield’s check into his- payroll account. In addition to that, when Mrs. Shields demanded her money, Cat-ledge paid her with a check from his trust account. However, he did not transfer the money from his payroll account into his trust account to cover the check.
¶ 50. It is not clear to us whose money covered Mrs. Shield’s checks. Catledge takes comfort in the fact that they were paid and that he always had money available to cover his obligations to her. Intent and ability to repay, however, have never been defenses to commingling trust funds with personal funds. We note, however, that the Bar provided us no evidence that the money in the trust account belonged to anyone but Catledge. If true, the most that can be said is that Catledge commingled in two accounts rather than one. If *190 not true, and the money actually belonged to other clients, then the Bar missed an opportunity to bring additional charges against Catledge. However, because we have no evidence to indicate otherwise, we must give Catledge the benefit of the doubt, and accept that the money in the trust account used to cover the checks to Mrs. Shields belonged to him.
¶ 51. Catledge’s busy schedule. Cat-ledge offers in mitigation the fact that, when the commingling took place, he was “very busy completing the important settlement[3] of the First Family cases.” He tells us he was required to travel throughout northeast Mississippi into several courts to obtain signatures and court approval on numerous settlément documents. We do not disagree that Catledge’s suit against First Family was important. But we are unaware of any ethical principle that would allow Catledge to consider one client more important than another.
. ¶ 52. Because the Bar offered no witnesses and, other than prior disciplinary actions, essentially no evidence against Catledge, we have only Catledge’s testimony and evidence regarding important questions such as the mistakes made by the bank with regard to the trust account.
¶ 53. We find Catledge’s conduct was not intentional, but was the result of negligence and lack of attention to his law firm’s business and his client. We further find that Catledge’s desire for a large attorney fee in the First Family cases blinded him to his responsibilities to Shields. Additionally, we find that Catledge’s prior history of discipline suggests that, to satisfy the public’s perception of integrity within the Bar and the profession, more is required than a public reprimand or a thirty-day suspension.
¶ 54. We therefore hold that Catledge shall be suspended from the practice of law for ninety days.
II. Whether the Tribunal erred as a matter of law by making findings of fact which required a conclusion of law that Catledge had violated the provisions of M.R.P.C. 8.4(a) and (c), but failed to include such a conclusion of law in its Opinion and Judgment.
¶ 55. The Bar argues that the Tribunal found Catledge only violated M.R.P.C. 1.15 and not M.R.P.C. 8.4(a) and (c) as well. Catledge argues that M.R.P.C. 1.15 is a rule within M.R.P.C. 8.4(a). As for M.R.P.C. 8.4(c), Catledge argues that the Tribunal found that “[t]here simply is no evidence to the Tribunal that Mr. Cat-ledge intended to utilize Mary Shields’ funds, but rather this was an offense of inadvertence.”
¶ 56. We find that this issue is without merit. The Tribunal opinion clearly outlined all three alleged violations of M.R.P.C. 1.15, 8.4(a) and 8.4(c). After hearing testimony and reviewing all the evidence determined that Catledge violated M.R.P.C. 1.15 only. The Tribunal knew of the other alleged violations and chose to find that Catledge violated only M.R.P.C. 1.15 and sanctioned Catledge for the violation. Despite all the alleged violations and prior disciplinary proceedings against Cat-ledge, the Tribunal’s determination was that he violated this one rule. This Court finds that the Tribunal did not abuse its discretion in its decision.
III. Whether the Complaint Tribunal abused its discretion by allowing Catledge to present testimony *191 and proof at the February 14, 2003 hearing.
¶ 57. The Bar argues that the Tribunal abused its discretion by allowing Catledge to present additional testimony on February 13, 2003. The complaint was filed on March 27, 2002. The Tribunal heard part of the case on August 1, 2002. The case remained open until the end of August to allow time for depositions from former Chief Justice Hawkins and Ronald Vaughn. The Tribunal limited the submission of the materials to 10 days after the completion of the depositions. The Bar argues that Catledge should have submitted the information by September 10, 2002, which was within the 180 days provided by Rule 8 M.R.D.
¶ 58. Catledge was given two unopposed extensions to have the record completed by October 1, 2002. Catledge filed a motion for leave to file additional affidavits for Reverend Eugene Brandon, Kenneth Mayfield, and himself. While the Bar opposed, objected and filed a motion to strike, the Tribunal overruled the objection and allowed the additional time. The Tribunal resumed the trial on February 14, 2003, and rendered an opinion on April 17, 2003. The Bar argues that the Tribunal’s order was past the 180 day period permitted by Rule 8 M.R.D. The Bar .believes that the Tribunal abused its discretion by granting Catledge’s initial motion dated September 29, 2002, and that the delay from August 1, 2002, to February 14, 2003, to complete the record was the fault of Catledge and without good cause. The Bar renews its objection that any testimony from February 14, 2003, should be stricken from the record as untimely.
¶ 59. Catledge relies upon the fact that his counsel was involved in two lengthy trials and the Tribunal’s December 2002 order. One of the trials was as counsel to the Secretary of State’s Office for three consolidated trials, which had a long standing trial set for August 2002. The trial lasted three months (August through November 2002) instead of the scheduled nine days. Following that case, counsel was involved in another case from December 2002 through mid-January 2003. In addition, Catledge relies upon the Tribunal’s December 11, 2002, order allowing further testimony and evidence to be presented at the next hearing. In addition, he argues that good cause was shown for the delay and considered by the Tribunal in its order. He further argues that allowing the hearing to continue to February 14, 2003, was not an abuse of discretion as professional regulatory matters have relaxed rules of practice, procedure and evidence. We agree.
¶ 60. On December 11, 2002, the Tribunal authorized Catledge to supplement the record by testimony and exhibits of Cat-ledge, Mayfield and Reverend Brandon. In its order the Tribunal acknowledged that the record was allowed to be supplemented by depositions of former Chief Justice Hawkins and Vaughn on August 1, 2002; the Tribunal extended the time to supplement on September 5 to September 30, 2002; and Catledge moved to file additional affidavits on September 30, 2002, to which the Bar objected. Despite these events, the Tribunal determined that Cat-ledge “should be allowed to present such additional evidence as necessary to properly frame his defense, but this does not waive The Mississippi Bar’s right of cross-examination.” Following this order, the Tribunal set February 14, 2003, as the day to resume the hearing.
¶ 61. Clearly, the Tribunal thought that Catledge should be given the opportunity to make a defense and acknowledging that the Bar still had the opportunity to cross-examine any witness. This Court finds that the Bar’s argument is without merit. *192 The Tribunal granted Catledge’s motions to allow for additional time and depositions, testimony and exhibits by order. Therefore, the Tribunal knew and ruled upon the motions and determined that despite the delays in the ease, Catledge should have the opportunity to give further evidence and the Bar had the right to cross-examine the witnesses. Accordingly, we find that the Bar’s argument is without merit and the Tribunal did not abuse its discretion.
CONCLUSION
¶ 62. For the foregoing reasons, William E. Catledge is suspended from the practice of law in the State of Mississippi for 90 days from and after this opinion and shall pay the costs of this proceeding.
¶ 63. WILLIAM E. CATLEDGE IS SUSPENDED FROM THE PRACTICE OF LAW IN THE STATE OF MISSISSIPPI FOR 90 DAYS FROM AND AFTER DATE OF THIS OPINION AND SHALL PAY THE COSTS OF THIS PROCEEDING.
SMITH, C.J., COBB, P.J., AND RANDOLPH, J.; CONCUR. GRAVES, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION. WALLER P.J., DIAZ AND CARLSON, JJ„ NOT PARTICIPATING.

. Catledge says his bookkeeper was unaware he was using the payroll account as a temporary trust account. From the payroll account, the bookkeeper wrote $3,500 in payroll checks, and Catledge wrote a $4,000 check to pay on a loan.

. The Bar lumps the factors of the need to deter similar conduct, preservation of the reputation and dignity of the profession and duty to protect the public into one category. This opinion will address their arguments in the three separate factors.

. Catledge represented 97 clients in a suit against First Family Finance Co. He tells us one of the reasons Mrs. Shield’s money was safe was that he had an attorney fee due him in the First Family case of $710,000.00.